# Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081CV00786

BAY EQUITY LLC _____ , PLAINTIFF(S),

v. TOTAL MORTGAGE
SERVICES, LLC, et al. ___ , DEFENDANT(S)



## SUMMONS

THIS SUMMONS IS DIRECTED TO Total Mortgage Services, LLC . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Middlesex Superior _____ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your **signed original** response with the Clerk's Office for Civil Business, Middlesex_ Court, 200 TradeCenter Dr., Woburn MA (address), by mail or in person, **AND**

   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Beck Reed Riden LLP, 155 Federal St., Ste. 1302, Boston, MA 02110

3. **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically request a jury trial** in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4. **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on __March 30_____, 20 20 .

_(signature)_

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20___, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____, 20___    Signature:_____

**N.B.    TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

March 31 , 20 20

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT DEPARTMENT
                                  CIVIL ACTION NO.: 2081CV00786

BAY EQUITY LLC,

            *Plaintiff*,

      v.

TOTAL MORTGAGE SERVICES, LLC,
STEVEN SIRMAIAN, and
DENISE PEACH,

            *Defendants*.

## AMENDED COMPLAINT

Plaintiff Bay Equity LLC ("Plaintiff" or "Bay Equity") hereby brings this action for injunctive relief and damages against Total Mortgage Services, LLC ("Total Mortgage") and two of its employees, Steven Sirmaian ("Sirmaian") and Denise Peach ("Peach") (collectively, "Defendants"), for: (1) tortious interference with contractual relations; (2) tortious interference with advantageous business relationships; (3) misappropriation of trade secrets; (4) unfair or deceptive trade practices; (5) civil conspiracy; and (6) unjust enrichment. In support of its claims, Bay Equity states the following:

## NATURE OF THE ACTION

1.     This case arises from Defendants' conspiracy to unlawfully compete with Bay Equity using its confidential customer information, in violation of its former employees' contractual obligations, and state law governing trade secrets and unfair competition.

2.     Bay Equity has a profitable and growing business as a national mortgage lender that depends, in large part, on maintaining the secrecy of its confidential information – including

its highly sensitive borrower information – and the relationships it has developed over years with its borrowers, potential borrowers, and referral sources.

3.      In July 2019, Bay Equity effected a limited asset purchase of a Northeast regional mortgage lender, Village Mortgage Company ("Village"). Pursuant to that sale, Village employees were onboarded as Bay Equity employees.

4.      Between December 2018 and March 2020, in a series of coordinated lift-outs, Defendants tortiously raided Village and, later, Bay Equity employees and moved them to Total Mortgage, a direct competitor. In effecting their most recent lift-out, Defendants encouraged Bay Equity employees to solicit each other to move to Total Mortgage, in violation of the no-raid provisions in the employees' employment agreements.

5.      Since the 2020 lift-outs, Bay Equity has learned that Total Mortgage, including by and through Bay Equity's former employees, has misappropriated Bay Equity's trade secrets – including its highly sensitive borrower information – and used that information to move Bay Equity's borrowers and prospective borrowers to Total Mortgage, in some cases without the borrowers' knowledge.

6.      In addition, Defendants have engaged in a campaign to spread misinformation about Bay Equity's financial and organizational health in order to drive a wedge between Bay Equity, on the one hand, and its employees, borrowers and prospective borrowers, and referral sources, on the other hand.

7.      Defendants' actions in this regard have unlawfully interfered with Bay Equity's employment agreements and advantageous business relationships, and violate state law governing trade secrets and unfair competition.

2

8.      Bay Equity, therefore, seeks injunctive relief to protect its trade secrets (and other confidential information) and business relationships from Defendants' wrongful conduct. Bay Equity also seeks damages flowing from Defendants' misconduct, in an amount to be determined at trial, and all other available relief.

## PARTIES, JURISDICTION, AND VENUE

9.      Plaintiff Bay Equity LLC is a limited liability company organized under the laws of California with a principal place of business in Corte Madera, California. Bay Equity also has locations across the United States, including six locations in Massachusetts, with two (Westford and Waltham) in Middlesex County.

10.     Defendant Total Mortgage Services, LLC is a limited liability company organized under the laws of Connecticut with a principal place of business in Milford, Connecticut. Total Mortgage has five offices in Massachusetts including at least one location (Woburn) in Middlesex County.

11.     Defendant Steven Sirmaian is an individual who worked for Village in its Portsmouth, New Hampshire location prior to its limited asset purchase by Bay Equity. He now works for Total Mortgage. On information and belief, Sirmaian resides in Derry, New Hampshire. Sirmaian has solicited Bay Equity employees including, on information and belief, at its Westford and Great Barrington, Massachusetts locations (one of which is in Middlesex County).

12.     Defendant Denise Peach is an individual who worked for Village in its Leominster, Massachusetts location prior to its limited asset purchase by Bay Equity. She now works for Total Mortgage. On information and belief, Peach resides in Townsend,

Massachusetts (in Middlesex County). Peach has solicited Bay Equity employees including, on

information and belief, at its Westford, Massachusetts location (in Middlesex County).

13.     Jurisdiction is proper in this Court because Defendants' actions have caused

tortious injury to Bay Equity within the Commonwealth that amounts to more than $50,000.

14.     Venue is proper in this Court as Defendant Peach resides in Middlesex County,

and both Bay Equity and Total Mortgage have places of business in Middlesex County.

## FACTUAL BACKGROUND

### Bay Equity

15.     Started in 2007 by three brothers, Bay Equity is a full-service retail mortgage

lending institution that focuses on home purchases, refinancing, and reverse mortgages.

16.     Bay Equity is headquartered in California and operates across the United States,

including in the Northeast, where it has offices in Massachusetts and Connecticut. Today, Bay

Equity is ranked among the top 30 home mortgage companies in the country.

### Bay Equity's Confidential Information

17.     Bay Equity has, over many years and at great effort and expense, developed,

accumulated, maintained and refined its trade secrets and other confidential information

including, among other things, its marketing plans and strategies, information concerning its

business partners and referral sources (including, *e.g.*, their identities and contact information),

information concerning its clients and potential clients (including, *e.g.*, their identities, contact

information, credit information, and borrowing needs), information concerning its active loan

files, information concerning its internal personnel and employee compensation arrangements, its

financial information (including, *e.g.*, company costs and revenues), its internal service and

operational manuals, its computer software and systems, the manner and methods by which Bay

4

Equity conducts business, and highly sensitive, personal information that has been provided to Bay Equity by its borrowers and prospective borrowers (collectively, "Confidential Information") to help its various employees sell Bay Equity's products and services.

18.     Notably, Bay Equity's Confidential Information includes portions of its Playbook, which is a compilation of proprietary, technology- and community-driven marketing strategies that Bay Equity has developed over the years using substantial resources, and which has enabled the company to successfully build its business.  The Playbook is instrumental to Bay Equity's growth and success.

19.     Bay Equity's Confidential Information is not generally known to the public.  Nor is it shared with borrowers, potential borrowers, or any other third parties absent a nondisclosure agreement, except in the case where a particular borrower's non-public personal information becomes part of, for example, an active loan file, at which point it may be known only to that borrower and to others with whom that borrower has confidential relationships.

20.     Accordingly, there is no reasonable way for third parties to know, for example, Bay Equity's internal financial or compensation figures, the contents of Bay Equity's active loan files or who its borrowers are, and the proprietary methods by which Bay Equity approaches marketing its services, including the entirety of the Playbook.  Indeed, it would be virtually impossible for a third party to recreate such information without Bay Equity's Confidential Information.

21.     Bay Equity's Confidential Information provides Bay Equity with a significant advantage over competitors like Total Mortgage, who do not know or use the Confidential Information and who, if armed with the Confidential Information, could unfairly identify, contact, and divert Bay Equity's clients and referral sources.

5

22.     Bay Equity has recognized (and continues to recognize) the paramount importance of safeguarding its Confidential Information and has taken numerous steps to safeguard and limit access to such information.

23.     For example, among other things, Bay Equity requires its employees to sign restrictive covenants agreements.  Bay Equity also password protects its systems containing its Confidential Information and requires two-factor authentication in order for personnel to access those systems.  Bay Equity also has policies that are designed to protect its Confidential Information, including policies prohibiting the sharing of passwords, governing the use of electronic devices, and prohibiting the unauthorized use and disclosure of Bay Equity's Confidential Information.

### Bay Equity's Borrowers and Goodwill

24.     Bay Equity's success is driven in large part by its reputation in the market and the strong referral network that it has built over the years.  Indeed, Bay Equity is known for having some of the best closing departments in the industry and, for this reason (among others), attorneys, realtors, and other referral sources have sent Bay Equity steady streams of business.

25.     Bay Equity's employees, including its Loan Officers, Branch Managers, Regional Managers, and Loan Officer Assistants, are charged with developing, maintaining, and growing the company's client, potential client, and referral networks.  In this regard, Bay Equity's employees serve as the face of Bay Equity.

26.     Bay Equity's relationships, especially with referral sources who can funnel numerous end customers (borrowers) to the company over the course of years, take substantial time and resources to maintain, and are one of Bay Equity's most important assets.

27.     In order to protect and grow its relationships, and so that its employees can perform their roles, Bay Equity invests in its employees, entrusts them with the goodwill it has developed over the years, and equips those employees (who have a need to know) with its Confidential Information.

### Bay Equity Effects Limited Asset Purchase of Village, Onboards Village Employees

28.     Bay Equity has also grown through a series of strategic acquisitions, including limited asset purchases, which have enabled it to expand into more geographic markets, bolstered by the acquired companies' talent and knowledge of local markets.

29.     In July 2019, Bay Equity effected a limited asset purchase of Village, a regional mortgage lender in the Northeast.  With the purchase, Bay Equity was poised to expand further into the Northeast market.

30.     Pursuant to the limited asset purchase, Bay Equity onboarded Village employees, who then became employees of Bay Equity.

*The Former Employees' Employment at Bay Equity*

31.     At least 16 individuals who became employees of Bay Equity pursuant to the limited asset purchase later left to go to Total Mortgage.  They may be referred to herein as the "Former Employees."

32.     The Former Employees variously worked out of Bay Equity's Connecticut and Massachusetts branches.

33.     The Former Employees were responsible for serving Bay Equity's borrowers and potential borrowers.  Together, the Former Employees represented a significant stream of revenue for Bay Equity.

7

34.     The Former Employees were also compensated to develop, maintain, and grow the company's client and referral relationships.  In this regard, the Former Employees served as the face of Bay Equity to its borrowers, potential borrowers, and referral sources.

35.     So that the Former Employees could do their job, Bay Equity provided them with access to its Confidential Information – including without limitation its comprehensive Playbook and other marketing strategies, information concerning its business partners and referral sources (including, *e.g.*, their identities and contact information), information concerning its clients and potential clients (including, *e.g.*, their identities, contact information, credit information, and borrowing needs), information concerning its active loan files, and highly sensitive, personal information that had been provided to Bay Equity by its borrowers and prospective borrowers – and entrusted them with its goodwill.

36.     Therefore, at the time that they ultimately left Bay Equity, the Former Employees were well-positioned to unfairly divert Bay Equity's clients and referral sources, using Bay Equity's Confidential Information and goodwill.

*The Former Employee's Employment Agreements*

37.     As a condition of their employment by Bay Equity, and in exchange for their employment and the benefits that flow therefrom, many of the Former employees were required to sign, and did sign, employment agreements (the "Employment Agreements") containing restrictive covenants that specifically address the confidentiality and protection of Bay Equity's Confidential Information, as well as Bay Equity's customer relationships and goodwill.

38.     The Employment Agreements each contain the following (or substantially similar) no-raid provision:

> The Employee covenants that during the term of the Employee's employment
> with the Company and for a period of twelve (12) months (the "Non Solicitation

8

Period") following the termination of the Employee's employment for any reason, including without cause or by resignation, the Employee will not, directly or indirectly, whether individually or in conjunction with any other person or entity, solicit for employment, employ or retain (or arrange to have any other person or entity employ or retain) any person who is at such time employed or retained by the Company or any of its affiliates, or has been employed or retained by the Company or any of its affiliates, within the preceding twelve (12) months.

Employment Agreements, ¶ 4.2.

39.     The Employment Agreements also contain the following (or substantially similar) nonsolicitation provision:

Employee hereby expressly acknowledges that the solicitation of, or the origination of a loan for, a consumer for whom a loan previously was processed and closed by Company may result in the imposition against Company of fines, penalties, reimbursements, indemnifications, damages and expenses ("Re Solicitation Losses"). Employee shall under no circumstances solicit any consumer for whom a loan previously was processed and closed by Company during the longer of (i) the twelve (12) month period following the date of such loan closing and (ii) such period as may be specified in the Applicable Requirements of the pertinent lender or investor with respect to the loan, if such solicitation or loan closing would result in a Re-Solicitation Loss to Company.

*Id.*

40.     The Employment Agreements also contain the following (or substantially similar) nondisclosure provision:

Protected Information.

(a) Confidentiality. Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this Article IV.  Employee acknowledges that all such Confidential Material is in the nature of a trade secret. For purposes of this Agreement, "Confidential Material" means information which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, (ii) gives Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of Company, or (iii) is designated as Confidential Material by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed

9

by Employee to be confidential and proprietary to Company. Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i) Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company; (ii) Company personnel names and contact information; (iii) Employee's compensation arrangements with Company; (iv) Training and educational materials provided by Company to Employee; (v) Marketing materials and/or marketing plans provided by Company to Employee; and (vi) Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

(b) Non-Disclosure. As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company. In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i) At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

(ii) At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

(iii) Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company,

10

including, without limitation, all materials containing Confidential Material.

*Id.*, ¶ 4.1.

41.     The Employment Agreements were specifically designed to protect Bay Equity's Confidential Information and goodwill – and to ensure that, when an employee left the company, Bay Equity would have sufficient time and breathing room to successfully transition its clients to other, remaining employees.

### Defendants' Early Raids of Village

42.     Defendants Sirmaian and Peach are former employees of Village. Sirmaian was a Producing Branch Manager for Village's Portsmouth, New Hampshire branch. Peach was a Regional Branch Manager for Village's Leominster, Massachusetts branch.

43.     Both Defendants left Village before its limited asset purchase by Bay Equity and, therefore, never became employees of Bay Equity. Sirmaian is now a Regional Manager for Total Mortgage. Peach is a District Branch Manager at Total Mortgage.

44.     Starting in December 2018 – before Village's purchase by Bay Equity – Defendants raided Village in two coordinated lift-outs.

45.     On New Years' Eve, December 31, 2018, thirteen employees – including Sirmaian and Peach – left Village to join Total Mortgage. These employees comprised producing Branch Managers, Loan Officers, and Processors operating out of Village's Leominster (MA), Andover (MA), Worcester (MA), and Portsmouth (NH) locations. Together, they made up well over 25 percent of Village's production.

46.     On April 14, 2019 – shortly after Bay Equity and Village began talks about a potential limited sale of Village's assets – Defendants effected another coordinated lift-out of

11

Village employees from Village's Portland, Maine location. Those employees also went to Total Mortgage.

47.     Sirmaian and Peach were instrumental in coordinating and effecting each of the lift-outs alongside (and on behalf of) Total Mortgage. Among other things, Sirmaian and Peach pressured employees (including their own prior reports) to leave for Total Mortgage, variously telling the employees that "everyone is leaving" Village (or words to that effect) and that they (Sirmaian and Peach) wanted the employees to be "on their team at Total" (or words to that effect).

48.     Indeed, several of the employees who left Village to join Total Mortgage have since confided in their former colleagues (who are now Bay Equity employees) that they struggled with the decision to leave Village, and did not want to leave Village, but felt pressured by Sirmaian to follow him to Total Mortgage.

49.     On information and belief, Sirmaian and Peach acted out of personal retaliation and malice for Village management, including, in particular, Laurel Caliendo ("Caliendo"). Sirmaian and Peach have demonstrated their animosity towards Caliendo on numerous occasions including to Village employees and to Bay Equity, directly. By way of example, Peach has called Caliendo "evil" to at least one former Village employee. And, just before the limited asset purchase, Sirmaian contacted Bay Equity and attempted to convince Bay Equity that it should not buy Village or hire Caliendo. In addition, Sirmaian has told certain of his former Village colleagues (who are now Bay Equity employees) that he wanted to move them over to Total Mortgage in order to "stick a finger in Caliendo's eye" (or words to that effect). While Bay Equity does not know the exact source of Sirmaian and Peach's animosity toward Caliendo, it understands from its employees who remain in touch with Sirmaian that Sirmaian believes that

Caliendo owes him a lot of money. Indeed, Bay Equity understands that Sirmaian and Caliendo are involved in litigation against each other.

## Defendants Tortiously Raid Bay Equity

50.    After Bay Equity's limited asset purchase of Village, Defendants continued their serial attacks – this time on Bay Equity.

51.    Between mid-2019 and March 2020, at least 16 employees left Bay Equity to join Total Mortgage, representing Branch Managers, Loan Officers, Loan Processors, Loan Officer Assistants, Closing Administrators, and Underwriters operating out of Bay Equity's Massachusetts and Connecticut branches (the Former Employees).

52.    Given the timing of the resignations, which occurred serially and in groups (with, *e.g.*, approximately nine resignations on February 21, 2020), Bay Equity believes that the Former Employees solicited and coordinated their resignations with each other, in violation of the no-raid provisions contained in their Employment Agreements, at Defendants' instruction and encouragement.

53.    Indeed, as with the earlier raids on Village, Defendants were the driving force behind the latest serial resignations – and used the same high-pressure, intimidation tactics to move Bay Equity's workforce to Total Mortgage.

54.    For example, Bay Equity has learned – from employees who were solicited by Defendants but chose to remain at Bay Equity as well as employees who left to join Total Mortgage but later returned to Bay Equity – that Defendants variously told Bay Equity employees that Bay Equity is a "sinking ship," that it is "going under," and that "everyone is leaving [Bay Equity] and coming to Total," or words to that effect, in efforts to move them to Total Mortgage.

13

55.     In addition, Defendants variously exploited the relationships between the former Village / Bay Equity employees, on the one hand, and remaining Bay Equity employees, on the other hand, in efforts to lure Bay Equity employees away.  Bay Equity has received multiple reports that Defendants variously used information concerning the finances and personal family matters of Bay Equity employees in order to scare them into joining Total Mortgage.

56.     Defendants have not acted alone in this regard; they have used the Former Employees to solicit remaining Bay Equity employees, in violation of the Former Employees' no-raid obligations contained in their Employment Agreements.

57.     Given the history between Defendants and the Former Employees (at Village) and the coordinated nature of the raids, on information and belief, Defendants knew about the Former Employees' Employment Agreements (and the obligations set forth therein) at the time that Defendants instructed and/or encouraged the Former Employees to solicit each other and other Bay Equity employees in violation of the Former Employees' no-raid obligations.

58.     Defendants' solicitation of Bay Equity employees, including their solicitation through the Former Employees, appear to be ongoing and have been directed into Massachusetts.

59.     Based on comments that Sirmaian has continued to make to Bay Equity employees about his desire to hurt Caliendo (and, by extension, Bay Equity) as well as Sirmaian's and Peach's previously demonstrated animus toward Caliendo, on information and belief, Sirmaian and Peach acted out of personal malice for Bay Equity management, including, in particular, Laurel Caliendo, when they effected the 2019-2020 employee lift-outs.

14

**Total Mortgage Moves Bay Equity's Clients Using Bay Equity's Confidential Information**

60.     Since the recent lift-outs, Bay Equity has learned that the Former Employees have variously moved its borrowers and Confidential Information to Total Mortgage.

61.     Indeed, Bay Equity has received multiple reports from employees that, on the way out the door to Total Mortgage:

> a.   At least three Former Employees removed all the paper files from their desks at Bay Equity;
>
> b.   One Former Employee (a producing Branch Manager operating out of Bay Equity's Great Barrington, Massachusetts location) took myriad files from Bay Equity, including its Playbook; and
>
> c.   One Former Employee (a Loan Officer Assistant) accessed Bay Equity's marketing materials with unusual frequency, presumably to mine specific details concerning Bay Equity's marketing strategies.

62.     In addition, Bay Equity has also found evidence in several of the Former Employees' email accounts demonstrating that they amassed and then misappropriated Bay Equity's Confidential Information concerning its borrowers and referral partners.  By way of one especially egregious example, in the weeks leading up to her resignation, one Former Employee Loan Officer emailed herself detailed contact information for Bay Equity's borrowers and referral contacts (including attorneys and realtors), under the pretext that she was sending herself "recipes."

63.     On information and belief, these Former Employees took Bay Equity's Confidential Information to use on behalf of Total Mortgage, and have since done so with Total Mortgage's knowledge of the information's wrongful acquisition and use.  In this regard, since

the departures, Total Mortgage has begun mimicking Bay Equity's Playbook, employing some of the marketing techniques contained therein, in an apparent attempt to make it appear that Bay Equity is, essentially, now Total Mortgage.

64.     The Former Employees have variously begun moving Bay Equity's borrowers to Total Mortgage, using Bay Equity's Confidential Information.  In this regard, Bay Equity has learned that Former Employees, acting on behalf of Total Mortgage, have moved or attempted to move at least six Bay Equity borrowers to Total Mortgage – including, in some cases, without the borrowers' knowledge or consent – with the latest known solicitation occurring on March 26, 2020.

65.     The Former Employees could not have moved or attempted to move the borrowers without using Bay Equity's Confidential Information.  Indeed, without such information, the Former Employees would not know who the borrowers were, how to reach them, anything about their borrowing needs (including, *e.g.*, the fact that they needed mortgages), or how to competitively sell the loans to those borrowers.

66.     Moreover, for the loans that were moved to Total Mortgage, Total Mortgage would not have been able to process the loans without having the borrowers' highly sensitive credit information.  Given the unlikelihood that the borrowers would have authorized a second lending institution to pull their credit reports – as evidenced by the fact that some of the loans were moved without the borrowers' knowledge or consent – it is clear that the Former Employees moved highly sensitive, Confidential Information concerning the borrowers' credit from Bay Equity to Total Mortgage.  This is particularly troubling as it not only threatens the secrecy of certain of Bay Equity's Confidential Information, but also implicates borrowers' private financial information.

67.     On information and belief, Total Mortgage is still in possession of Bay Equity's Confidential Information that was brought over by the Former Employees.

68.     By wrongfully taking Bay Equity's Confidential Information, and using that information to move Bay Equity's borrowers, the Former Employees violated the nonsolicitation and nondisclosure obligations contained in their Employment Agreements.

69.     On information and belief, Total Mortgage knew about the Former Employees' Employment Agreements at the time of the misappropriation.  By encouraging and otherwise enabling the Former Employees to use Bay Equity's Confidential Information on behalf of Total Mortgage, Total Mortgage unlawfully interfered with the Employment Agreements, including the nonsolicitation and nondisclosure provisions contained therein.

**Defendants Spread Misinformation to Damage Bay Equity's Reputation and Goodwill**

70.     Defendants' campaign to injure Bay Equity in the marketplace has not stopped at raiding its employees and misappropriating its Confidential Information and clientele – Defendants have also sought to degrade Bay Equity's reputation and referral relationships by spreading misinformation concerning Bay Equity's financial and organizational health.

71.     Among other things, Defendants have variously falsely told Bay Equity's referral sources that Bay Equity is closing.  As a result of these false rumors, Bay Equity has heard from several attorneys with whom it works (and who send borrowers to Bay Equity) that the attorneys are concerned that Bay Equity will not be able to close on loans.

72.     Similarly, Bay Equity's real estate referral partners have told the company that they have heard that the company's loan officers are all leaving and that Bay Equity is going out of business.

73.     Bay Equity has received reports of these and other referral partners backing away from Bay Equity and choosing instead to work with other lenders because of the uncertainty that these rumors have caused about Bay Equity's ability to service its clients.

74.     The uncertainty and reputational harm that Defendants have caused to Bay Equity in this regard is irreparable, as Bay Equity relies on those relationships to develop business.

75.     Acknowledging the harm Defendants have caused to Bay Equity, on February 27, 2020, Total Mortgage's Chief Executive Officer, Scott Penner ("Penner"), left a message for Bay Equity's CEO, Brett McGovern, which Bay Equity returned the next day (February 28).  Having taken Bay Equity's employees, its relationships, and its Confidential Information, and having revamped its marketing and advertising in efforts to mimic Bay Equity, Total Mortgage sought to complete Bay Equity's replacement in the Northeast – Penner asked Bay Equity if it would allow Total Mortgage to take over several of Bay Equity's leases in Connecticut.

### Harm to Bay Equity

76.     Defendants – both independently and by and through the Former Employees – have variously directly and indirectly interfered with the contractual and advantageous business relationships that Bay Equity has with its employees (including the Former Employees), borrowers, potential borrowers, and referral sources, thereby causing Bay Equity damages and irreparable harm (which is continuing) in the form of lost talent (and, by extension, business presence) in the Northeast, lost profits, and lost streams and potential streams of revenue.

77.     Total Mortgage has used and, upon information and belief, will continue to use Bay Equity's Confidential Information to divert business and opportunities from Bay Equity to Total Mortgage, thereby irreparably harming Bay Equity.

78.     Defendants have campaigned and, upon information and belief, continue to campaign to spread false information concerning Bay Equity's financial and organizational health, thereby irreparably damaging Bay Equity's goodwill and reputation in the marketplace.

79.     Given Defendants' refusal to comply with their common law and statutory obligations, and in order to protect its legitimate business interests, Bay Equity has commenced this action seeking damages, injunctive relief, and all other available relief.

## COUNT I

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (ALL DEFENDANTS)

80.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

81.     Bay Equity had enforceable contracts with certain of its Former Employees, the Employment Agreements.

82.     The Employment Agreements each contained restrictive covenants including no-raid, nonsolicitation, and nondisclosure provisions.

83.     On information and belief, during all relevant periods, Defendants knew of the Former Employees' Employment Agreements and the restrictive covenants set forth therein.

84.     By instructing and encouraging Former Employees to solicit each other and other Bay Equity employees, Defendants induced those Former Employees to breach the no-raid provisions of their Employment Agreements.

85.     By encouraging and enabling Former Employees to move borrowers to Total Mortgage, Defendants knowingly induced those Former Employees to breach the nonsolicitation provisions of their Employment Agreements.

19

86.     By encouraging and enabling Former Employees to use Bay Equity's Confidential Information (including its highly sensitive borrower information) on behalf of Total Mortgage, Defendants knowingly induced those Former Employees to breach the nondisclosure provisions of their Employment Agreements.

87.     In inducing Former Employees to breach their Employment Agreements, Defendants acted by improper means (including without limitation by disparaging Bay Equity and using its Confidential Information) and with improper motives (including without limitation to misappropriate Bay Equity's business using its Confidential Information and, with respect to Sirmaian and Peach, to retaliate against Bay Equity management based on personal malice).

88.     As a direct and proximate result of Defendants' misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the loss of its workforce in the Northeast (and the business it represents), its borrowers and referral sources (and the economic benefits that flow therefrom), and its Confidential Information.

## COUNT II

### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS
### (TOTAL MORTGAGE)

89.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

90.     Bay Equity had economically advantageous business relationships with certain of its borrowers and prospective borrowers, as well as its referral sources, which provided Bay Equity with business and, with respect to its referral sources, repeat business over multiple years.

91.     On information and belief, Total Mortgage knew of Bay Equity's relationships with its borrowers, prospective borrowers, and referral sources, and the economic benefits that flowed (or would have flowed) to Bay Equity therefrom.

92.     By diverting Bay Equity's borrowers and prospective borrowers, and damaging Bay Equity's relationships with its referral sources, Total Mortgage intentionally interfered with those economically advantageous business relationships.

93.     In intentionally interfering with Bay Equity's economically advantageous business relationships, Total Mortgage acted by improper means and with improper motives, including without limitation by disparaging Bay Equity and using its Confidential Information.

94.     As a direct and proximate result of Total Mortgage's misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the advantageous business relationships it had with certain of its borrowers and referral sources, and the economic benefits that flow therefrom.

## COUNT III

### MISAPPROPRIATION OF TRADE SECRETS (M.G.L. C. 93, S. 42)
### (TOTAL MORTGAGE)

95.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

96.     Bay Equity's Confidential Information constitutes a trade secret protectable under Massachusetts law.

97.     Specifically, Bay Equity's above-described Confidential information – including without limitation its comprehensive Playbook and other marketing strategies, information concerning its business partners and referral sources (including, *e.g.*, their identities and contact information), information concerning its clients and potential clients (including, *e.g.*, their

identities, contact information, credit information, and borrowing needs), information concerning its active loan files, and highly sensitive, personal information that has been provided to Bay Equity by its borrowers and prospective borrowers – comprises Bay Equity's confidential information from which Bay Equity derives independent economic value and competitive advantage by virtue of its not being accessible, through proper means, to competitors like Total Mortgage, which could profit from its use or disclosure. Bay Equity has invested significant time and money into developing its Confidential Information.

98.     Bay Equity has taken reasonable steps to protect and maintain the secrecy of its Confidential Information, including without limitation by requiring employees to sign restrictive covenants agreements, password-protecting and requiring double authentication for access to its systems, and implementing policies that are designed to protect its Confidential Information.

99.     The Former Employees' access to and knowledge of the Confidential Information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Former Employees owed Bay Equity both contractually and as employees of Bay Equity.

100.     Acting on behalf and as agents of Total Mortgage, certain Former Employees have, through improper means, taken, used, and/or disclosed Bay Equity's trade secrets in an effort to divert borrowers, potential borrowers, and referral sources from Bay Equity to Total Mortgage, in violation of their express obligations to Bay Equity.

101.     Total Mortgage knowingly received and used Bay Equity's trade secrets, with knowledge that those trade secrets had been improperly taken from Bay Equity by the Former Employees.

22

102.    As a direct and proximate result of Total Mortgage's misconduct, Bay Equity has

suffered and will continue to suffer damages in an amount to be determined at trial and

irreparable harm, including without limitation the loss of its borrowers and referral sources (and

the economic benefits that flow therefrom), and its Confidential Information.

## COUNT IV

### UNFAIR OR DECEPTIVE TRADE PRACTICES (M.G.L. C. 93A, S. 11)
### (TOTAL MORTGAGE)

103.    Bay Equity repeats and incorporates herein by reference the allegations set forth

in each of the foregoing paragraphs.

104.    At all times relevant to this action, Bay Equity has been engaged in trade or

commerce within the meaning of M.G.L. c. 93A, s. 11.

105.    At all times relevant to this action, Total Mortgage has been engaged in trade or

commerce within the meaning of M.G.L. c. 93A, s. 11.

106.    Total Mortgage engaged in a course of conduct designed to hurt Bay Equity, to

Total Mortgage's unfair advantage.  Total Mortgage's unfair conduct included without limitation

tortiously raiding Bay Equity's workforce in coordinated, serial lift-outs, misappropriating Bay

Equity's trade secrets, and using Bay Equity's Former Employees (and the trade secrets and

goodwill they took from Bay Equity) to divert Bay Equity's borrowers, prospective borrowers,

and referral sources to Total Mortgage.

107.    Moreover, in order to further impair Bay Equity's business, Total Mortgage

engaged in a campaign to spread misinformation about Bay Equity's ability to service its clients.

Total Mortgage's misrepresentations, described above, were likely to mislead Bay Equity's

employees, borrowers, potential borrowers, and referral sources as to Bay Equity's financial and

organizational health.  Among other things, these misrepresentations were likely to affect which

23

lender borrowers would choose to provide and service their mortgages, and which lender referral sources would recommend for providing and servicing mortgages.

108.     Total Mortgage's actions in this regard, and as set forth above, constitute unfair methods of competition, or unfair or deceptive acts or practices, within the meaning of M.G.L. c. 93A, s. 11.

109.     Total Mortgage's methods of competition, or unfair or deceptive acts or practices, were willful and knowing within the meaning of M.G.L. c. 93A, s. 11.

110.     Total Mortgage's misconduct occurred primarily and substantially in Massachusetts.

111.     As a direct and proximate result of Total Mortgage's misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the loss of its workforce in the Northeast (and the business it represents), its borrowers and referral sources (and the economic benefits that flow therefrom), and its Confidential Information.

### COUNT V

MISAPPROPRIATION OF TRADE SECRETS (CONN. GEN. STAT. S. 35-50, *ET SEQ.*)
(TOTAL MORTGAGE)

112.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

113.     Bay Equity's Confidential Information constitutes a trade secret protectable under Connecticut law.

114.     Specifically, Bay Equity's above-described Confidential information – including without limitation its comprehensive Playbook and other marketing strategies, information concerning its business partners and referral sources (including, *e.g.*, their identities and contact

information), information concerning its clients and potential clients (including, *e.g.*, their identities, contact information, credit information, and borrowing needs), information concerning its active loan files, and highly sensitive, personal information that has been provided to Bay Equity by its borrowers and prospective borrowers – comprises Bay Equity's confidential information from which Bay Equity derives independent economic value and competitive advantage by virtue of its not being accessible, through proper means, to competitors like Total Mortgage, which could profit from its use or disclosure. Bay Equity has invested significant time and money into developing its Confidential Information.

115.    Bay Equity has taken reasonable steps to protect and maintain the secrecy of its Confidential Information, including without limitation requiring employees to sign restrictive covenants agreements, password-protecting and requiring double authentication for access to its systems, and implementing policies that are designed to protect its Confidential Information.

116.    The Former Employees' access to and knowledge of the Confidential Information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Former Employees owed Bay Equity both contractually and as employees of Bay Equity.

117.    Acting on behalf and as agents of Total Mortgage, certain Former Employees have, through improper means, taken, used, and/or disclosed Bay Equity's trade secrets in an effort to divert borrowers, potential borrowers, and referral sources from Bay Equity to Total Mortgage, in violation of their express obligations to Bay Equity.

118.    Total Mortgage knowingly received and used Bay Equity's trade secrets, with knowledge that those trade secrets had been improperly taken from Bay Equity by the Former Employees.

25

119.     Total Mortgage's conduct constitutes a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat., s. 35-50, *et seq.*

120.     As a direct and proximate result of Total Mortgage's misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the loss of its borrowers and referral sources (and the economic benefits that flow therefrom), and its Confidential Information.

## COUNT VI

UNFAIR OR DECEPTIVE TRADE PRACTICES (CONN. GEN. STAT. S. 42-110A, *ET SEQ.*)
(TOTAL MORTGAGE)

121.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

122.     At all times relevant to this action, Total Mortgage has been a person within the meaning of Conn. Gen. Stat. s. 42-110b.

123.     Bay Equity's primary commercial activity is servicing mortgage borrowers.

124.     Bay Equity is a competitor to Total Mortgage in the mortgage servicing market.

125.     Total Mortgage engaged in a course of conduct designed to hurt Bay Equity (including its ability to compete in an open and fair marketplace), to Total Mortgage's unfair advantage.  Total Mortgage's unfair conduct included without limitation tortiously raiding Bay Equity's workforce in coordinated, serial lift-outs, misappropriating Bay Equity's trade secrets, and using Bay Equity's Former Employees (and the trade secrets and goodwill they took from Bay Equity) to divert Bay Equity's borrowers, prospective borrowers, and referral sources to Total Mortgage.

126.     Moreover, in order to further impair Bay Equity's business, Total Mortgage engaged in a campaign to spread misinformation about Bay Equity's ability to service its clients.

Total Mortgage's misrepresentations, described above, were likely to mislead Bay Equity's employees, borrowers, potential borrowers, and referral sources as to Bay Equity's financial and organizational health. Among other things, these misrepresentations were likely to affect which lender borrowers would choose to provide and service their mortgages, and which lender referral sources would recommend for providing and servicing mortgages.

127.   Total Mortgage's actions in this regard, and as set forth above, constitute unfair methods of competition, or unfair or deceptive acts or practices, in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. s. 42-110b.

128.   Total Mortgage's methods of competition, or unfair or deceptive acts or practices, were willful and knowing.

129.   Total Mortgage's misconduct occurred within three years of the filing of this Complaint.

130.   As a direct and proximate result of Total Mortgage's misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the loss of its workforce in the Northeast (and the business it represents), its borrowers and referral sources (and the economic benefits that flow therefrom), and its Confidential Information.

131.   For Total Mortgage's violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Bay Equity seeks actual damages, punitive damages, and reasonable attorney's fees and costs.

132.   In accordance with CUTPA requirements, Bay Equity will serve a copy of this Complaint upon the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut.

## COUNT VII

### CIVIL CONSPIRACY
### (ALL DEFENDANTS)

133.    Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

134.    Defendants each agreed to act together and in concert with one another, pursuant to a secretive, common plan, scheme, and design, to disrupt and injure Bay Equity's business, breach the Former Employees' Employment Agreements, misappropriate Bay Equity's trade secrets, and ultimately divert business and referral sources from Bay Equity, all in knowing breach of the Former Employees' contractual, common law, and statutory obligations, as well as Defendants' common law and statutory obligations.

135.    By their conduct described above, Defendants committed tortious acts in furtherance of their plan.

136.    As a direct and proximate result of Defendants' misconduct, Bay Equity has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm, including without limitation the loss of its workforce in the Northeast (and the business it represents), its borrowers and referral sources (and the economic benefits that flow therefrom), and its Confidential Information.

## COUNT VIII

### UNJUST ENRICHMENT
### (ALL DEFENDANTS)

137.    Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

138.    By their unlawful actions described above, Defendants have been unjustly

enriched, to Bay Equity's detriment, including by Bay Equity's Confidential Information (and

the value thereof) and the business that has flowed and will continue to flow through Bay

Equity's borrowers, potential borrowers, and referral sources to Total Mortgage.

139.    Defendants knew of the benefits they received in this regard.

140.    Permitting Defendants' retention of those benefits under the circumstances set

forth above would be inequitable.

## REQUESTS FOR RELIEF

**WHEREFORE,** for the reasons set forth above, Bay Equity respectfully requests that this Court:

A.      Grant preliminary and permanent injunctive relief enjoining Defendants as set

forth below:

      i.   Enjoin Defendants from retaining, transmitting, using, and/or disclosing any
         trade secrets or other confidential or proprietary business information
         belonging to Bay Equity.

      ii.  Enjoin Defendants from, directly or indirectly, soliciting or hiring any
         employee of Bay Equity in violation of the restrictions set forth in his or her
         restrictive covenant obligations to Bay Equity.

      iii. Enjoin Defendants from directly or indirectly soliciting, communicating, or
         accepting or doing business with Bay Equity's current, former, or prospective
         customers that any former employee of Bay Equity who is now employed by
         Total Mortgage serviced, or about which they learned confidential information
         while such employee was employed with Bay Equity, for purposes of offering
         or accepting goods or services similar to or competitive with those offered by
         Bay Equity.

      iv.  Enjoin Defendants from inducing any of Bay Equity's employees to violate
         their restrictive covenants with Bay Equity, or otherwise interfering with such
         agreements.

      v.   Enjoin Defendants from accepting any client or prospective client that the
         Former Employees serviced, or about which they learned confidential
         information while the Former Employees were employed with Bay Equity.

B.      Enter judgment for Bay Equity on all Counts in this Complaint, and award

damages to Bay Equity in an amount to be determined at trial, together with interest, costs, and

attorneys' fees; and

C.      Award all other relief that this Court determines is appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY
ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,

BAY EQUITY LLC,

By its attorneys,

Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
Rebecca Bact, BBO No. 682411
Hannah T. Joseph, BBO No. 688132
Kyle Vieira, BBO No. 705967
BECK REED RIDEN LLP
155 Federal Street, Ste. 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665
*rbeck@beckreed.com*
*sriden@beckreed.com*
*bact@beckreed.com*
*hjoseph@beckreed.com*
*kvieira@beckreed.com*

Dated:  March 30, 2020

30

## Commonwealth of Massachusetts

MIDDLESEX, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081CV00786

_Bay Equity LLC_ , PLAINTIFF(S),

v.

_Denise Peach_ , DEFENDANT(S)

### SUMMONS

THIS SUMMONS IS DIRECTED TO _Denise Peach_ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the
Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been
filed in the _Middlesex Superior_ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.  **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide
    the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the
    opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect
    to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an
    extension of time in writing from the Court.**

2.  **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a
    copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a.  Filing your **signed original** response with the Clerk's Office for Civil Business, _Middlesex_ Court,
        _200 Trade Center Dr. Woburn_ (address), by mail or in person, **AND**

    b.  Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following
        address: _Beck Reed Riden, 155 Federal St. Ste 1502 Boston MA 02110_

3.  **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer
    must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint.
    Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to
    use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are
    based on the same facts or transaction described in the Complaint, then you must include those claims
    in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this
    lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your
    Answer or in a written demand for a jury trial that you must send to the other side and file with the
    court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a
    **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion
    to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If
    you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions"
    described in the rules of the Court in which the complaint was filed, available at
    www.mass.gov.courts/case-legal-res/rules of court.

4.  **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.  **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on ___March 30___ , 20 20.

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20____, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____ , 20____   Signature:_____

**N.B.   TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

_____ , 20____

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT DEPARTMENT
                                                  CIVIL ACTION NO.:

---

BAY EQUITY LLC,

                          *Plaintiff,*

            v.

DENISE PEACH,

                          *Defendant.*

---

## COMPLAINT

### INTRODUCTION

Total Mortgage Services, LLC ("Total Mortgage") and its employees Steven Sirmaian and Defendant Denise Peach variously orchestrated the *en masse* departure from Bay Equity LLC ("Bay Equity") of, to date, sixteen employees from several of Bay Equity's offices since July 2019, with fourteen of those in February 2020 (the "Former Employees"). The simultaneous departure of so many employees, several with no notice, has resulted in severe negative impacts on Bay Equity's workforce. Since the time of the mass departure, Bay Equity has continued to receive notices of business moving away from Bay Equity and to Total Mortgage.

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Bay Equity LLC is a limited liability company organized under the laws of California with a principal place of business in Corte Madera, California. Bay Equity also has

locations across the United States, including six locations in Massachusetts, with two (Westford and Waltham) in Middlesex County.

2.     Denise Peach is an individual who worked for Village from approximately December 2013 to December 2018 in its Leominster, Massachusetts prior to Bay Equity's acquisition of Village's assets, and who, upon information and belief, resides in Townsend, Massachusetts, in this county. Ms. Peach was hired by Total Mortgage in approximately January 2019. Upon information and belief, Ms. Peach has solicited Bay Equity employees in Massachusetts (including within this county), including those at its Westford location.

3.     Jurisdiction is proper in this Court because the Ms. Peach's actions have caused tortious injury to Bay Equity within the Commonwealth that amounts to more than $50,000.

4.     Venue is proper in this Court because Bay Equity has a place of business in Middlesex County.

## FACTUAL BACKGROUND

### Bay Equity

5.     Bay Equity was founded in 2007 by three brothers, Brett McGovern (now its chief executive officer), Casey McGovern (now its president and chief production officer), and Jon McGovern (now its chief business development officer).

6.     Bay Equity is a full-service retail mortgage lending institution focusing on home purchases, refinancing, and reverse mortgages.

7.     Bay Equity was founded just months before the economic crisis of 2008, but through agile planning, it continued to grow, focusing especially on its retail locations. Bay Equity is a licensed lender in 39 states and has retail branches in 27 states, and has rapidly grown

2

into a leader in the home mortgage industry.  Today, Bay Equity is ranked among the top 30 home mortgage companies in the country.

### Bay Equity's Confidential Information

8.      Bay Equity has, over many years and at great effort and expense, developed, accumulated, maintained and refined trade secrets and other confidential information, including, among other things, its marketing plans and strategies, information concerning its business partners and referral sources (including, *e.g.*, their identities and contact information), information concerning its clients and potential clients (including, *e.g.*, their identities and contact information, and borrowing needs), information concerning its active loan files, information concerning its internal personnel and employee compensation arrangements, its financial information (including, *e.g.*, company costs and revenues), its internal service and operational manuals, its computer software and systems, the manner and methods by which Bay Equity conducts business, and highly sensitive, personal information that has been provided to Bay Equity by its borrowers and prospective borrowers (collectively, "Confidential Information") to help its various employees sell Bay Equity's products.

9.      Notably, Bay Equity's Confidential Information includes portions of its Playbook, which is a compilation of proprietary, technology- and community-driven marketing strategies that Bay Equity has developed over the years using substantial resources and which has successfully enabled the company to build its business.  The Playbook is instrumental to Bay Equity's growth and success.

10.      Bay Equity's Confidential Information is not generally known to the public.  Nor is it shared with borrowers, potential borrowers, or any other third parties, absent a nondisclosure agreement, except in the case where a particular customer's non-public personal information

3

becomes part of, for example, an active loan file, at which point it may be known only to that customer and to others with whom that customer has confidential relationships.

11.    Accordingly, there is no reasonable way for third parties to know, for example, internal financial or compensation figures, the contents of Bay Equity's active loan files or who its borrowers are, and the proprietary methods by which Bay Equity approaches marketing its services, including the entirety of the Playbook.  Indeed, it would be virtually impossible for a third party to recreate such information without Bay Equity's Confidential Information.

12.    Bay Equity's Confidential Information provides Bay Equity with a significant advantage over competitors like Total Mortgage, who do not know or use the Confidential Information and who, if armed with the Confidential Information, could unfairly identify, contact, and divert Bay Equity's clients and referral sources.

13.    Bay Equity has recognized (and continues to recognize) the paramount importance of safeguarding its Confidential Information and has taken numerous steps to safeguard and limit access to such information.

14.    For example, among other things, Bay Equity requires its employees to sign an employment agreement containing confidentiality, customer nonsolicit, no-raid provisions, and other restrictive covenants.  Bay Equity also password-protects its systems containing its Confidential Information and requires double authentication for personnel to access those systems.  Bay Equity also has policies that are designed to protect its Confidential Information, including policies prohibiting the sharing of passwords, governing the use of electronic devices, and prohibiting the unauthorized use and disclosure of Bay Equity's Confidential Information.

**<u>Bay Equity's Borrowers and Goodwill</u>**

4

15.     As employees of Bay Equity, the Former Employees were variously responsible for developing and maintaining relationships with Bay Equity's customers (borrowers) and referral sources (real estate agents, attorneys, and insurance agents, among others) in order to sell Bay Equity's products.

16.     Bay Equity's success is driven in large part by its reputation in the market and the strong referral network that it has built over the years.  Indeed, Bay Equity is known for having some of the best closing departments in the industry and, for this reason (among others), attorneys, realtors, and other referral sources have sent Bay Equity steady streams of business.

17.     Bay Equity's employees, including its Loan Officers, Branch Managers, Regional Managers, and Loan Officer Assistants, are charged with developing, maintaining, and growing the company's client, potential client, and referral networks and, in this regard, they act as the face of Bay Equity.  These relationships, especially with referral sources who can funnel numerous end customers (borrowers) to Bay Equity over the course of years, take substantial time and resources to maintain, and are one of Bay Equity's most important assets.  To this end, Bay Equity invests in its employees, enabling them to sustain the relationships, and as part of this, equips those employees (who have a need to know) with its Confidential Information and entrusts them with the goodwill it has developed over the years.

18.     The Former Employees serviced a significant total number of clients, and had relationships with a significant number of referral sources, of Bay Equity.

19.     The Former Employees were compensated to, among other things, build and fortify existing customer and referrer relationships and to develop new customer and referrer relationships and customer and referrer goodwill using Bay Equity's Confidential Information.

5

20.    With respect to the clients they serviced, the Former Employees were the face of Bay Equity to their customers.

### Bay Equity's Strategic Acquisitions and First Raid by Total Mortgage

21.    Bay Equity has grown through a series of strategic acquisitions over the years, which has enabled it to expand into more geographic markets, bolstered by the acquired companies' talent and knowledge of local markets.

22.    In or around July 2019, Bay Equity effected a limited asset purchase of Village, a regional mortgage lender in the Northeast.

23.    With the Village limited asset purchase, Bay Equity was poised to expand further into the Northeast market.

24.    Prior to the asset purchase, on December 31, 2018 (New Year's Eve), in a coordinated lift-out, thirteen Village employees left Village to join Total Mortgage.  These employees comprised Producing Branch Managers, Loan Officers, and Processors operating out of Village's Massachusetts branches in Leominster, Andover, and Worcester, as well as its Portsmouth, New Hampshire, location.

25.    Based on information and belief, Mr. Sirmaian, former Producing Branch Manager of Village's Portsmouth, New Hampshire branch and current Regional Manager at Total Mortgage, and Ms. Peach, former Regional Branch Manager of Village's Leominster, Massachusetts branch and current District Branch Manager at Total Mortgage, convinced many of their colleagues to leave Village and were instrumental in organizing the lift-out with Total Mortgage.

26.    In early April 2019, Bay Equity and Village began talks about a potential sale of Village's assets.

6

27.     On April 14, 2019, five Village employees, operating from Village's Portland, Maine location, resigned *en masse*.  These individuals included a Producing Branch Manager, two Loan Officers, and two Processors.  All five employees left to work for Total Mortgage.[1]

28.     Based on information and belief, again, Mr. Sirmaian (who was by then working on behalf of Total Mortgage) was instrumental in soliciting the five employees and effecting the second lift-out with Total Mortgage in April 2019.

29.     As a result of the April lift-out, Village was ultimately devalued and its assets were sold for a lower purchase price than originally anticipated.  The lowered value was due, in significant part, to Village's impaired ability to bring, develop, and maintain relationships with referral sources and borrowers, and to, in turn, process loans for those borrowers.  In short, with fewer employees and fewer potential and actual relationships, Village's assets were significantly less valuable.

30.     The employees remaining at Village—including many who later resigned in February 2020—became Bay Equity employees.

### The Former Employees' Employment with Bay Equity

31.     Prior to their abrupt, coordinated resignations with (for the most part) no advance notice, the Former Employees held the following titles at Bay Equity:

- Joni Bloom: Loan Officer Assistant, South Windsor, Connecticut;

- Bridget Breed: Loan Officer, West Hartford, Connecticut;

- Richard Breed: Branch Manager, West Hartford, Connecticut;

- Jarret Eaniello: Loan Officer, West Hartford, Connecticut;

---

[1] Three additional employees left in May and June 2019 for Total Mortgage.  One has since returned to Bay Equity.

- Suzanne Greene: Senior Loan Officer, South Windsor, Connecticut;

- J. Tracey Jackson: Branch Manager, Bethany, Connecticut;

- Jennifer Jackson-Torres: Branch Manager, Glastonbury, Connecticut;

- James Johnston: Branch Manager, Niantic, Connecticut;

- Carl MacMath: Senior Loan Processor, West Hartford, Connecticut;

- Marc Nathan: Senior Loan Officer, West Hartford, Connecticut;

- Colleen Nolin: Closing Administrator, Avon, Connecticut;

- Shelita Peterson: Loan Officer Assistant, Niantic, Connecticut;

- Robert Reeser: Loan Officer Assistant, Avon, Connecticut; and

- Andrea Stearns: Loan Officer Assistant, West Hartford, Connecticut.

**The Former Employees Agree to Protect Bay Equity's Confidential Information and Not To Solicit Its Employees or Customers**

32.     Many of the Former Employees who accepted employment with Total Mortgage signed an agreement with Bay Equity in consideration for their employment (collectively, the "Employment Agreements").

33.     The Employment Agreements each contain the following (or substantially similar) covenant specifying that the employee would not solicit Bay Equity's employees, as follows:

> The Employee covenants that during the term of the Employee's employment with the Company and for a period of twelve (12) months (the "Non Solicitation Period") following the termination of the Employee's employment for any reason, including without cause or by resignation, the Employee will not, directly or indirectly, whether individually or in conjunction with any other person or entity, solicit for employment, employ or retain (or arrange to have any other person or entity employ or retain) any person who is at such time employed or retained by the Company or any of its affiliates, or has been employed or

8

retained by the Company or any of its affiliates, within the preceding
twelve (12) months.

Employment Agreements, ¶ 4.2.

34.     In addition to the employee no-raid covenants contained in the Employment

Agreements described above, the Employment Agreements each contain the following (or

substantially similar) provision concerning the solicitation of Bay Equity's customers:

> Employee hereby expressly acknowledges that the solicitation of, or the
> origination of a loan for, a consumer for whom a loan previously was
> processed and closed by Company may result in the imposition against
> Company of fines, penalties, reimbursements, indemnifications, damages
> and expenses ("Re-Solicitation Losses"). Employee shall under no
> circumstances solicit any consumer for whom a loan previously was
> processed and closed by Company during the longer of (i) the twelve (12)
> month period following the date of such loan closing and (ii) such period
> as may be specified in the Applicable Requirements of the pertinent lender
> or investor with respect to the loan, if such solicitation or loan closing
> would result in a Re-Solicitation Loss to Company.

*Id*.

35.     The Employment Agreements specifically address the confidentiality and

protection of Bay Equity's Confidential Information as follows:

> Protected Information.
>
> (a) Confidentiality. Employee hereby acknowledges, understands and
> agrees that all "Confidential Material," as defined below, is the exclusive
> and confidential property of Company which shall at all times be regarded,
> treated and protected as such in accordance with this Article IV.
> Employee acknowledges that all such Confidential Material is in the
> nature of a trade secret. For purposes of this Agreement, "Confidential
> Material" means information which is available to or used in the business
> of Employee and (i) is proprietary to, about or created by Company, (ii)
> gives Company a competitive business advantage or the opportunity of
> obtaining such advantage or the disclosure of which would be detrimental
> to the interests of Company, or (iii) is designated as Confidential Material
> by Company, is known by Employee to be considered confidential by

9

Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to Company. Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i) Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company; (ii) Company personnel names and contact information; (iii) Employee's compensation arrangements with Company; (iv) Training and educational materials provided by Company to Employee; (v) Marketing materials and/or marketing plans provided by Company to Employee; and (vi) Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

(b) Non-Disclosure. As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company. In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i) At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

(ii) At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

(iii) Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and

10

documents made by Employee or which came into his/her possession prior
to or during the term of this Agreement, concerning the business and
affairs of Company, including, without limitation, all materials containing
Confidential Material.

Employment Agreements, ¶ 4.1.

36.     Each of the Employment Agreements discussed above was specifically designed
to protect Bay Equity's Confidential Information and customer goodwill, and to give Bay Equity
sufficient time to ensure that its clients continue to receive the highest quality of service during
the period of transition after an employee departs.

**Total Mortgage Tortiously Raids Bay Equity; With Ms. Peach's Encouragement, the
Former Employees Violate Their Obligations By Soliciting Each Other**

37.     After Bay Equity's acquisition of Village's assets, Mr. Sirmaian and Ms. Peach's
solicitations of former Village employees were consistent and persistent over the course of 2019
and into 2020.  The solicitations by Mr. Sirmaian, Ms. Peach, and others at Total Mortgage did
not just involve offering jobs at Total Mortgage—they variously offered above-market signing
bonuses designed to lure former Village employees away from Bay Equity.

38.     The solicitations also took the form of pressure from Mr. Sirmaian.  Further, Mr.
Sirmaian and Ms. Peach also disparaged Bay Equity and its managers, variously suggesting that
the solicited employees' jobs were not secure, and reflecting personal animus against former-
Village, current-Bay Equity Regional Manager Laurel Caliendo.

39.     The goal of Mr. Sirmaian and Ms. Peach's solicitation campaign has been to put
Bay Equity out of business in the Northeast.

40.     Following Bay Equity's limited asset purchase of Village, and as a result of Mr.
Sirmaian and Ms. Peach's coordinated and persistent solicitation, former Village employees
continued leaving Village (now Bay Equity) in dribs and drabs to join Total Mortgage.

11

41.     In October 2019, Christopher Sweeney, a Loan Officer in Bay Equity's Westford, Massachusetts location, was recruited by Mr. Sirmaian to join Total Mortgage.[2] Then, in January 2020, Stacey Burnham, an underwriter who worked from home in Connecticut, left for Total Mortgage effective January 24, 2020.

42.     In February 2020, the resignations picked up substantially.  Three employees resigned on February 11, 2020: J. Tracey Jackson, the Branch Manager for the Bethany, Connecticut location; Jennifer Jackson-Torres, the Branch Manager for the Glastonbury, Connecticut location; and Robert Reeser, a Loan Officer Assistant in the Avon, Connecticut location.

43.     On February 21, 2020, nine additional employees resigned from Bay Equity.  Six were from the West Hartford, Connecticut location: Bridget Breed, a Loan Officer; Richard Breed, the Branch Manager; Jarret Eamiello, a Loan Officer Assistant; Carl MacMath, a Senior Loan Processor; Marc Nathan, a Senior Loan Officer; and Andrea Stearns, a Loan Officer Assistant.  Two more resigned from the South Windsor, Connecticut, location: Joni Bloom, a Loan Officer Assistant; and Suzanne Greene, a Senior Loan Officer.  A ninth, Colleen Nolin, a Closing Administrator in the Avon, Connecticut location, tendered her resignation on February 21, 2020.[3]

44.     Two additional employees from the Niantic, Connecticut, location resigned on February 26, 2020: James Johnston, the Branch Manager, and Shelita Peterson, a Loan Officer Assistant.

---

[2] Mr. Sweeney has since returned to Bay Equity as of February 2020.

[3] Ms. Nolin gave notice of her resignation on February 21, 2020, with a termination date during the week of March 2, 2020.

45.     By the end of February 2020, fourteen former Village / Bay Equity employees had resigned within about two weeks, on top of the two others who had already resigned since Bay Equity's acquisition of Village's assets—for a total of sixteen resigned employees. This included nearly Bay Equity's entire West Hartford, Connecticut branch.

46.     Bay Equity has since learned each of these sixteen Former Employees accepted roles with Total Mortgage. Total Mortgage is direct competitor to Bay Equity because, like Bay Equity, Total Mortgage is also a mortgage lender reaching a similar clientele.

47.     Of the Village or former Village employees who have left since December 2018, only two employees – separate from the 37 employees who left for Total Mortgage – did not go to Total Mortgage. One of those two retired.

48.     Bay Equity has learned that these defections were calculated: on information and belief, in the Northeast, Total Mortgage has been hiring only former Village employees from Bay Equity during that time period. Further, Total Mortgage employees (including former Village / Bay Equity employees who had joined Total Mortgage) have been deliberately spreading misinformation in order to divert Bay Equity's business to Total Mortgage, and to put Bay Equity out of business in the Northeast.

49.     Among other things, on information and belief, Total Mortgage has attempted (often successfully) to intimidate Bay Equity employees into moving to Total Mortgage, including by telling Bay Equity employees that Bay Equity is a "sinking ship" or "going under" and that, if the employees stay at Bay Equity, they will lose their jobs.

50.     In addition, Total Mortgage, Ms. Peach, and Mr. Sirmaian have variously exploited the relationships between the former Village / Bay Equity employees, on the one hand, and the remaining Bay Equity employees, on the other hand, to lure Bay Equity employees away.

13

For example, Bay Equity has received multiple reports that at least Total Mortgage and Mr. Sirmaian have used information concerning the finances and personal family matters of Bay Equity employees in order to scare them into joining Total Mortgage.

51.     After the February 21, 2020 departures, numerous other former Village employees now at Bay Equity were contacted by Mr. Sirmaian and others (including Ms. Peach) at Total Mortgage, pressuring them to leave Bay Equity along with the others who had already left.

52.     The campaign to spread misinformation has not stopped at Bay Equity's employees.  Total Mortgage has also falsely told Bay Equity's referral sources that the company is closing.  Bay Equity has heard from attorneys its employees work with, and who send borrowers to Bay Equity, that they are concerned that Bay Equity will not be able to close on loans.  Similarly, Bay Equity's real estate referral partners have told the company that they have heard that the company's loan officers are all leaving and that Bay Equity is going out of business.

53.     Bay Equity has received reports of these and other referral partners backing away from Bay Equity and going with another lender because of the uncertainty that these rumors have caused about Bay Equity's ability to service its clients.

54.     The uncertainty and reputational harm that Total Mortgage has caused to Bay Equity in this regard is irreparable, as Bay Equity relies on those relationships to develop business.

55.     Along with its employees and referral sources, Bay Equity has lost its entire Playbook (quite literally) to Total Mortgage.

14

56.     Indeed, Bay Equity understands upon information and belief that at least one former Bay Equity Loan Officer misappropriated the company's Playbook and brought it with her to Total Mortgage.

57.     Since the misappropriation of the Playbook, Total Mortgage has entirely revamped its advertising to start mimicking Bay Equity's – all with the apparent intent to make it appear that Bay Equity is, essentially, now Total Mortgage.

58.     In addition, Bay Equity believes that former Bay Equity employees have moved borrowers – who were in the process of securing loans with Bay Equity – with them to Total Mortgage, sometimes without the borrower' knowledge.  If this is true, it is not only Bay Equity's business and information that is at stake, but the borrowers' private financial information as well.

59.     In particular, at least five borrowers received communications from departing Bay Equity employees requesting—or instructing—the borrower to move to Total Mortgage.  In at least one case, the borrower unwittingly completed the loan process with Total Mortgage, not even realizing the company sponsoring the loan had changed.  In another, a former Bay Equity employee, J. Tracey Jackson, offered the borrower a $500 credit to move over to Total Mortgage with her.  In another case, former employee Jarret Eamiello told Ms. Caliendo to stop communicating with a borrower, stating that the borrower "was not happy that you or someone from [Bay Equity] reached out to her."  In none of these cases did the departing employee request permission to take its active loan files with them—or even provide notice to Bay Equity that the employee was doing so.

60.     Additionally, on information and belief, departing employees mined and took Bay Equity's confidential information, including its borrower information and Playbook, to use on

behalf of Total Mortgage.  For example, at least one departing employee accessed borrower information with unusual frequency just before he resigned.  Another took multiple files with her just prior to her resignation—during the same week she stated that she believed she would lose her job if she stayed at Bay Equity.  Another employee sent herself an email titled "recipes" containing a Microsoft Word document called "Notes" that actually included a list of contact information for her current borrowers and referral sources, including real estate agents and attorneys.

61.     In addition to these instances of misappropriation, on information and belief, Former Employees took borrower information – including highly sensitive credit information – in order to move the borrowers to Total Mortgage.  Indeed, Total Mortgage would not have been able to process the borrowers' loans without having the borrowers' credit information and it is unlikely that the borrowers would have authorized two different institutions to pull their credit reports in order to authorize one loan.  If this is true, it is not just Bay Equity's information that is at risk – Total Mortgage has also exposed individual borrowers' sensitive financial information, notwithstanding restrictions contained in certain federal laws that protect such information.

62.     Further, on February 27, 2020, Total Mortgage's Chief Executive Officer, Scott Penner, left a message for Bay Equity's CEO, Brett McGovern, which Executive Vice President of Branch Finance & Onboarding Autumn Van Rooy returned the next day (February 28).  After having taken Bay Equity's people, relationships, borrowers, and marketing plans and information, and having mimicked its advertising, Mr. Penner sought to complete Total Mortgage's replacement of Bay Equity, asking if Bay Equity would allow Total Mortgage to take over Bay Equity's leases in certain locations that were raided by Total Mortgage.  Bay Equity declined.

16

## Harm to Bay Equity

63.     Certain of the Former Employees collectively managed a significant portion of Bay Equity's book of business.

64.     By engaging in a continued pattern of encouraging the Former Employees to resign and join a direct competitor, Total Mortgage, Steven Sirmaian, and Defendant Denise Peach variously knowingly placed Bay Equity in a compromised position in the marketplace.

65.     Total Mortgage, Steven Sirmaian, and Defendant Denise Peach variously knowingly intended to permanently harm Bay Equity's ability to service its customer base and its reputation in the community.

66.     Total Mortgage, Steven Sirmaian, and Defendant Denise Peach variously knew that the Former Employees, as the face of Bay Equity to the clients they service and as its connection to Bay Equity's referral network, were in a position to unfairly take those customer relationships from Bay Equity, using Bay Equity's goodwill and Confidential Information, and move them to Total Mortgage, thereby causing substantial irreparable harm to Bay Equity.

67.     Total Mortgage's wrongful conduct has caused untold financial harm to Bay Equity.

68.     Total Mortgage, Steven Sirmaian, and Defendant Denise Peach variously knew or should have known that by raiding a significant number of Bay Equity's employees in violation of their Employment Agreements, they were unfairly and recklessly exposing Bay Equity to significant financial harm and effectively crippling Bay Equity's ability to service certain of its customers in the Northeast and maintain its position in the marketplace.

17

## COUNT I

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

69.     Bay Equity repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

70.     Bay Equity and certain of the Former Employees are parties to certain employment agreements, which place client nonsolicitation, employee nonsolicitation, and/or confidentiality restrictions on those individuals.

71.     Upon information and belief, given the highly coordinated resignations and exchange of information, the Former Employees with the assistance of Total Mortgage solicited one another to leave employment with Bay Equity, in violation of their contractual obligations to Bay Equity.

72.     Moreover, Total Mortgage, through its members, managers, and agents, knew or should have known of Bay Equity's employment agreements.

73.     Ms. Peach deliberately reached into Bay Equity with knowledge of the employment agreements in connection with a massive *en masse* employee departure that has eviscerated Bay Equity's workforce.

74.     With knowledge of the relevant employee restrictions, Ms. Peach has permitted (if not encouraged) the Former Employees to further violate those agreements by soliciting each other and Bay Equity's customers.

75.     By encouraging or permitting these individuals to solicit Bay Equity's clients in violation of their employment agreements (and improperly using Bay Equity's relationships and Confidential Information to do so), and otherwise encouraging or permitting these individuals to

18

violate their employment agreements, Ms. Peach knowingly interfered with Bay Equity's

employment agreements with these individuals using improper means and/or motives.

76.     Ms. Peach knew, or should have known, that this volume of coordinated

employee departures could cause significant harm to Bay Equity's business in the Northeast.

77.     As a direct and proximate cause of Ms. Peach's tortious interference, Bay Equity

has suffered irreparable harm and damages.

### <u>COUNT II</u>

CIVIL CONSPIRACY

78.     Bay Equity repeats and incorporates herein by reference the allegations set forth

in each of the foregoing paragraphs.

79.     Ms. Peach agreed to act together and in concert with Mr. Sirmaian and Total

Mortgage, as well as with the Former Employees, pursuant to a secretive, common plan, scheme

and design, to disrupt and injure Bay Equity's business, breach the various Former Employees'

employment agreements with and other duties (including fiduciary duties) to Bay Equity, and

ultimately divert business from Bay Equity, all in knowing breach of the Former Employees'

contractual, common law, and statutory obligations, as well as Total Mortgage, Steven Sirmaian,

and Defendant Denise Peach's common law and statutory obligations.

80.     By her conduct described above, Ms. Peach committed tortious acts in furtherance

of their plan.

81.     As a direct and proximate cause of the Ms. Peach violations of her common law

and statutory obligations Bay Equity, conducted with the assistance of the Former Employees,

who breached their own contractual, fiduciary, common law, and statutory duties to Bay Equity,

Ms. Peach has caused Bay Equity to suffer irreparable harm and damages.

19

82.

<u>REQUESTS FOR RELIEF</u>

**WHEREFORE,** for the reasons set forth above, Bay Equity respectfully requests that this Court:

A.      Grant preliminary and permanent injunctive relief enjoining the Ms. Peach as set forth below:

1.  Enjoin Ms. Peach from retaining, transmitting, using, or disclosing any trade secrets or other confidential or proprietary business information belonging to Bay Equity.

2.  Enjoin Ms. Peach from, directly or indirectly, soliciting or hiring any employee of Bay Equity in violation of the restrictions set forth in his or her restrictive covenant obligations to Bay Equity.

3.  Enjoin Ms. Peach from inducing any of Bay Equity's employees to violate their restrictive covenants with Bay Equity.

B.      Enter judgment for Bay Equity on all Counts in this Complaint, and award damages to Bay Equity in an amount to be determined at trial, together with interest, costs, and attorneys' fees; and

C.      Award all other relief that this Court determines is appropriate.

**THE PLAINTIFF DEMANDS A TRIAL**
**BY JURY ON ALL COUNTS SO TRIABLE.**

20

Respectfully submitted,

BAY EQUITY LLC.,

By its attorneys,

Russell Beck, BBO No. 561031
   *rbeck@beckreed.com*
Stephen D. Riden, BBO No. 644451
   *sriden@beckreed.com*
Hannah T. Joseph, BBO No. 688132
   *hjoseph@beckreed.com*
Kyle Vieira, BBO No. 705967
   *kvieira@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Ste. 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665

Dated:  March 19, 2020

21

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                              SUPERIOR COURT DEPARTMENT
                                            CIVIL ACTION NO.:   2081CV00786

BAY EQUITY LLC,
                                                      3/24/2020
                  *Plaintiff,*

            v.                         NH

DENISE PEACH,                                      **RECEIVED**

                  *Defendant.*

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff Bay Equity LLC hereby moves that this Court appoint Beacon Hill Research or

any other Massachusetts constable, as a special process server, to serve the Complaint,

Summons, and any other initial pleadings on the Defendant Denise Peach.

Respectfully submitted,

BAY EQUITY LLC,

By its attorneys,

Russell Beck, BBO No. 561031
*rbeck@beckreed.com*
Stephen D. Riden, BBO No. 644451
*sriden@beckreed.com*
Hannah T. Joseph, BBO No. 688132
*hjoseph@beckreed.com*
Kyle Vieira, BBO No. 705967
*kvieira@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Ste. 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665

Motion Allowed
Attest:
Deputy Assistant Clerk
(                  , J.)

Dated: March 19, 2020

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 2081CV00786 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Bay Equity Llc vs. Peach, Denise | Michael A. Sullivan, Clerk of Court Middlesex County |
|---|---|

| TO: Stephen D Riden, Esq. Beck Reed Riden LLP 155 Federal St Suite 1302 Boston, MA 02110 | COURT NAME & ADDRESS Middlesex County Superior Court - Woburn 200 Trade Center Woburn, MA 01801 |
|---|---|

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                    DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 06/17/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 07/17/2020 | |
| All motions under MRCP 12, 19, and 20 | 07/17/2020 | 08/17/2020 | 09/15/2020 |
| All motions under MRCP 15 | 05/13/2021 | 06/14/2021 | 06/14/2021 |
| All discovery requests and depositions served and non-expert depositions completed | 03/09/2022 | | |
| All motions under MRCP 56 | 04/08/2022 | 05/09/2022 | |
| Final pre-trial conference held and/or firm trial date set | | | 09/05/2022 |
| Case shall be resolved and judgment shall issue by | | | 03/20/2023 |

The final pre-trial deadline is not the scheduled date of the conference. You will be notified of that date at a later time.

Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

This case is assigned to

| DATE ISSUED 03/24/2020 | ASSISTANT CLERK Maria Pantos | PHONE (781)939-2781 |
|---|---|---|

Date/Time Printed: 03-24-2020 12:34:42                                                    SCV020\ 040918