UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BAY EQUITY LLC,

*Plaintiff*,

v.

TOTAL MORTGAGE SERVICES,
LLC, STEVEN SIRMAIAN, and
DENISE PEACH,

*Defendants*.

Civil Action No.: 1:20-cv-10693-IT

**PLAINTIFF'S OPPOSITION TO
DEFENDANT DENISE PEACH'S
MOTION TO DISMISS FOR
<u>FRAUDULENT JOINDER</u>**

Plaintiff Bay Equity LLC ("Bay Equity") hereby opposes Defendant Denise Peach's

Motion to Dismiss for Fraudulent Joinder (the "Motion," Dkt. No. 13).

This case arises from Defendants' conspiracy to unlawfully compete with Bay Equity

using its confidential customer information, in knowing violation of its former employees'

contractual obligations and state law governing trade secrets and unfair competition.  Bay Equity

filed suit against Defendant Denise Peach ("Peach") on March 19, 2020 in Middlesex Superior

Court, Commonwealth of Massachusetts, and later amended its complaint on March 30, 2020 to

add Defendants Total Mortgage Services, LLC ("Total Mortgage") and Steven Sirmaian

("Sirmaian").  *See* Am. Compl. (Dkt. No. 3-1, p. 3).

Defendants removed this action based on diversity, notwithstanding that Defendant Peach

is a Massachusetts resident.  *See* Notice of Removal (Dkt. No. 3), ¶¶ 4, 9, 15-17; *see also* Am.

Compl. ¶ 12; Answer (Dkt. No. 12), ¶ 12.  Now, in order to prove diversity, as Defendants must

do to establish federal jurisdiction, Defendant Peach has filed the instant Motion claiming

fraudulent joinder.[1]

The Motion fails for three chief reasons: (1) drawing all inferences in Plaintiff's favor, the Amended Complaint states plausible claims against Peach for tortious interference (Count I), civil conspiracy (Count VII), and unjust enrichment (Count VIII) sufficient to survive a Rule 12(b)(6) motion to dismiss; (2) notwithstanding a Rule 12(b)(6) analysis, Peach cannot show (and has not shown) – much less by clear and convincing evidence, as is her "heavy" burden on an application for a finding of fraudulent joinder – that Plaintiff has no theory of liability against her whatsoever; [2] and (3) the self-serving affidavits Peach has filed in support of her Motion – which the Court should ignore altogether on a 12(b)(6) application for dismissal but may consider for the limited purpose of determining fraudulent joinder – merely underscore the factual disputes that are core to Plaintiff's case against Peach, which the Court must resolve in Plaintiff's favor at this stage and are better left for a final determination by a fact-finder after discovery has been taken.[3]  For these reasons, discussed more fully below, the Court should deny the Motion in its entirety and remand the case back to Middlesex Superior Court pursuant to Plaintiff's Motion to Remand (Dkt. No. 20).

---

[1] The Motion does not assert actual fraud in the pleading of facts.  Total Mortgage and Sirmaian have not moved to dismiss any of the claims against them in this action.  However, on or about April 29, 2020, Total Mortgage filed a separate lawsuit against Bay Equity in the State of Connecticut Superior Court alleging that *this action* constitutes an abuse of process and that this is vexatious litigation.

[2] As discussed below, the Motion appears to seek both dismissal pursuant to Rule 12(b)(6) and a finding of fraudulent joinder.  The standards for analyzing each application, however, are markedly different from one another – a fact which the Motion ignores completely – as the standard for establishing fraudulent joinder is much more difficult for the removing party to satisfy.  Therefore, even if the Court determines that the Amended Complaint fails to pass muster under Rule 12(b)(6), it must still apply the harder-to-satisfy fraudulent joinder analysis for the purpose of determining jurisdiction.

[3] Defendant has filed two affidavits in support of her Motion (Dkt Nos. 15 and 16), which simply deny any wrongdoing by Peach.  Those affidavits are far from dispositive as to Peach's alleged misconduct, but rather create issues of fact that should only be decided based on a well-developed body of evidence.

**FACTUAL BACKGROUND**

As alleged in the Amended Complaint, and detailed below, this case arises from Defendants' conspiracy to raid Bay Equity's employees (including by inducing the employees to solicit each other) and to use the employees to move Bay Equity's business to Total Mortgage. Defendants have variously unlawfully interfered with the former employees' restrictive covenants agreements with Bay Equity, as well as violated trade secrets law and other state laws governing, *e.g.*, unfair competition.  Defendants' misconduct in this regard is continuing – following the *en masse* and serial resignations of Bay Equity employees in February and March 2020, Bay Equity has learned that its former employees who went to Total Mortgage (the "Former Employees") have moved its confidential information, customers and potential customers, and referral sources to Total Mortgage, apparently at the instruction and encouragement of Defendants.

Accordingly, Defendant Peach cannot show that the Amended Complaint fails to state plausible claims against her – much less, by clear and convincing evidence, that Plaintiff has <u>no</u> viable theory of liability against her whatsoever – and the Court should deny the Motion.

A.     **Bay Equity's Business and Acquisition of Village**

Bay Equity is a full-service retail mortgage lending institution that focuses on home purchases, refinancing, and reverse mortgages.  Am. Compl. ¶ 15.  It is a profitable and growing business which success is driven in large part by its reputation in the market, the exclusive use of its confidential information (which includes highly sensitive borrower information), and the strong relationships that it has built over the years with its borrowers, potential borrowers, and referral network (*e.g.*, attorneys and realtors).  *Id.* ¶¶ 2, 21, 24.  Because of the significant advantage that Bay Equity's confidential information provides it vis-à-vis its competitors,

including Total Mortgage, Bay Equity has taken numerous steps to safeguard and limit access to its confidential information.  *Id.* ¶¶ 21-23.  Those measures include, among other things, requiring its employees to sign restrictive covenants agreements, password-protecting and requiring double authentication for access to its systems, and implementing policies that are designed to protect its confidential information, including policies forbidding the sharing of passwords, governing the use of electronic devices, and prohibiting the unauthorized use and/or disclosure of its confidential information.  *Id.* ¶ 23.

As part of its growth strategy to expand into additional geographic markets, Bay Equity effected a limited asset purchase of Village Mortgage Company ("Village"), a regional mortgage lender in the Northeast, in July 2019.  *Id.* ¶¶ 3, 28-29.  Pursuant to the limited asset purchase, Bay Equity onboarded Village employees, who then became employees of Bay Equity.  *Id.* ¶ 30. As a condition of their employment with Bay Equity, and in exchange for their Bay Equity employment and the benefits that flowed therefrom, many of those employees signed restrictive covenants agreements with Bay Equity (the "Employment Agreements") that contained, among other things, no-raid, nonsolicitation, and nondisclosure provisions.  *Id.* ¶¶ 37-40.

## B.     Defendants Raid Village and, Later, Bay Equity Employees

Defendants Sirmaian and Peach are former employees of Village.  Am. Compl. ¶ 42. Sirmaian was a Producing Branch Manager for Village's Portsmouth, New Hampshire branch. *Id.*  Peach was a Regional Branch Manager at Village's Leominster, Massachusetts branch.  *Id.* Both Defendants left Village before its limited asset purchase by Bay Equity and, therefore, never became employees of Bay Equity.  *Id.* ¶ 43.  Sirmaian is now a Regional Manager for Total Mortgage and Peach is a District Branch Manager at Total Mortgage.  *Id.*

Starting in December 2018 – before Village's purchase by Bay Equity – Defendants raided Village's employees in two coordinated lift-outs.  *Id.* ¶ 44.  The first raid occurred on New Year's Eve, December 31, 2018, when 13 employees – including Defendants Sirmaian and Peach – left Village to join Total Mortgage.  *Id.* ¶ 45.  The employees comprised producing Branch Managers, Loan Officers, and Processors operating out of Village's Leominster (MA), Andover (MA), Worcester (MA), and Portsmouth (NH) locations, representing well over 25 percent of Village's production at the time.  *Id.*

The second raid occurred less than four months later, on April 14, 2019, when Defendants effected another coordinated lift-out of Village employees for employment with Total Mortgage, this time from its Portland, Maine branch.  *Id.* ¶ 46.  Notably, this raid occurred shortly after Bay Equity and Village began talks about a potential sale of Village's assets.  *Id.*  It is therefore likely that Defendants would have leveraged any uncertainty that a potential acquisition may have caused among its employees to convince those employees to move to Total Mortgage.  *See id.*

Sirmaian and Peach were instrumental in coordinating and effecting each of the lift-outs from Village.  *Id.* ¶ 47.  Among other things, Sirmaian and Peach pressured employees (including their own prior reports) to leave for Total Mortgage, variously telling the employees that "everyone is leaving" Village (or words to that effect) and that they (Sirmaian and Peach) wanted the employees to be "on their team at Total" (or words to that effect).  *Id.*  Sirmaian and Peach would have been particularly effective at convincing employees to leave Village for Total Mortgage because they had supervised those employees at Village (and therefore developed a managerial relationship with them).  *See id.* ¶¶ 42, 47-48.  Indeed, several of the employees who left Village to join Total Mortgage reported that they struggled with the decision to leave

Village, did not want to leave Village, but felt pressure to follow their supervisor to Total Mortgage. *Id.* ¶ 48.

In effecting the raids, Sirmaian and Peach apparently each acted out of personal retaliation and malice for Laurel Caliendo ("Caliendo"), who was in Village management at the time. *Id.* ¶ 49. Indeed, Sirmaian and Peach have demonstrated their animosity for Caliendo on numerous occasions, including to Village employees and to Bay Equity, directly. *Id.* By way of example, Peach has called Caliendo "evil." *Id.*

After Bay Equity's limited asset purchase of Village, Total Mortgage continued its serial attacks – this time on Bay Equity. *Id.* ¶ 50. Between mid-2019 and March 2020, at least 16 Bay Equity employees left Bay Equity to join Total Mortgage, representing Branch Managers, Loan Officers, Loan Processors, Loan Officer Assistants, Closing Administrators, and Underwriters. *Id.* ¶ 51. Nine of these resignations occurred on the very same day – February 21, 2020. *Id.* ¶ 52. Based on the timing of the resignations, which occurred serially and in groups, the fact that the Former Employees all went to Total Mortgage, and the similarity in circumstances between the Village and Bay Equity lift-outs, Bay Equity believes that the Former Employees solicited and coordinated their resignations with one another – in violation of the no-raid provisions contained in their Employment Agreements – at the instruction and/or encouragement of Total Mortgage, Sirmaian, and Peach. *Id.* ¶¶ 52-56.

Indeed, as with the prior Village raids, Bay Equity believes that Total Mortgage, Sirmaian, and Peach solicied Bay Equity employees. *Id.* ¶¶ 53-55, 58. Of course, Bay Equity's insight into Defendants' roles in the lift-outs is so far limited to information it has received from those individuals who are willing to speak to Bay Equity (*e.g.*, its employees) – the full scope of Defendants' misconduct cannot be known by Bay Equity absent discovery. *See id.* ¶ 54.

Given Sirmaian and Peach's history with the Former Employees (from working with them at Village) and the coordinated nature of the raids, it is highly likely that Defendants knew about the Former Employees' Employment Agreements with Bay Equity (and the obligations set forth therein) at the time of the raids. *Id.* ¶ 57. Moreover, given Sirmaian and Peach's previously-demonstrated animus towards Caliendo, who now serves as Regional Sales Manager at Bay Equity, Bay Equity believes that Sirmaian and Peach acted out of personal malice for Bay Equity management when they participated in the Bay Equity employee lift-outs. *Id.* ¶ 59.

**C.    Defendants Use Bay Equity's Former Employees to Move Its Confidential Information, Goodwill, and Referral Sources**

Since the recent lift-outs, Bay Equity has learned that a number of its Former Employees have taken Bay Equity's confidential information on their way out the door. Am. Compl. ¶¶ 18, 60-62. Moreover, Former Employees have used Bay Equity's confidential information (including highly sensitive information concerning the identities of Bay Equity's borrowers, their credit and finances, and their particular needs and preferences) to move Bay Equity's borrowers to Total Mortgage – including, in some cases, without the borrowers' knowledge or consent – and to process loans for those borrowers. *Id.* ¶¶ 64-66. In so doing, those Former Employees have violated their Employment Agreements with Bay Equity. *Id.* ¶ 68. By encouraging and enabling the Former Employees to use Bay Equity's confidential information to move borrowers to Total Mortgage, Total Mortgage has unlawfully interfered with their Employment Agreements which, on information and belief, it knew of at the time of the misappropriation. *Id.* ¶ 69.

Moreover, based on their various involvement in planning and effecting the employee lift-outs (from Village and, later, Bay Equity) with Total Mortgage starting in December 2018 and continuing through March 2020, and the foreseeable consequences of those lift-outs – including the movement of confidential information and borrowers to Total Mortgage – it is very

likely that Sirmaian and Peach conspired with Total Mortgage to use the Former Employees to move Bay Equity's confidential information and borrowers to Total Mortgage in knowing violation of the Former Employees' Employment Agreements.  Am. Compl. ¶¶ 1, 83-87, 134; *see also* Am. Compl. ¶¶ 49 (Sirmaian and Peach held personal malice for Caliendo and desired to hurt her business), 53 (Defendants planned and effected the employee raids on Bay Equity), 71-72 (alleging Defendants' efforts to damage Bay Equity's business), 60-69 (concerning the Former Employees' movement of Bay Equity's confidential information and borrowers to Total Mortgage).

Compounding the harm they have caused to Bay Equity, Defendants have also variously sought to degrade Bay Equity's reputation and referral relationships by spreading misinformation concerning Bay Equity's financial and organizational health.  *Id.* ¶ 70-72.  As a result of these false rumors, Bay Equity has heard of several referral partners backing away from Bay Equity (and choosing to work with other lenders) due to concerns about Bay Equity's ability to serve its clients.  *Id.* ¶¶ 71, 73.  These referral relationships are essential to Bay Equity's ability to develop business.  *Id.* ¶ 74.

### D.      Peach's Involvement in Defendants' Wrongdoing

As the Amended Complaint alleges, Peach was involved in Defendants' scheme to harm Bay Equity.  Apparently motivated (at least in part) by a personal vendetta against Caliendo, Bay Equity believes that Peach participated the Bay Equity employee raids with Sirmaian and Total Mortgage, just as she had with respect to the Village lift-outs.  Am. Compl.¶¶  49, 50-59. Further, as discussed above in Section C, Bay Equity believes (and alleges) that Peach encouraged Former Employees to solicit Bay Equity employees in violation of the no-raid provisions contained in their Employment Agreements, despite having full knowledge of the

Employment Agreements at the time.  *Id.* ¶¶ 52, 56-57.  The Amended Complaint also alleges, and one can reasonably infer from the totality of the circumstances, that Peach (along with Sirmaian and Total Mortgage) conspired to use the Former Employees to move Bay Equity's confidential information and borrowers to Total Mortgage, in knowing violation of their Employment Agreements.  *See supra* Section C; Am. Compl. ¶¶ 1, 83-87, 134; *see also* Am. Compl. ¶¶ 49, 53, 60-69, 71-72.

Based on this misconduct, the Amended Complaint asserts claims against Peach for tortious interference with contractual relations (Count I), civil conspiracy (Count VII), and unjust enrichment (Count VIII).

## **LEGAL STANDARD**

By her Motion, Peach appears to seek both dismissal of the claims against her pursuant to Rule 12(b)(6) and a finding of fraudulent joinder.  *See* Denise Peach's Memorandum in Support of Her Motion to Dismiss for Fraudulent Joinder ("Memo.," Dkt. No. 14), p. 3 (applying the Rule 12(b)(6) standard for dismissal), 4 (asking the Court to consider affidavits filed in support of the Motion for purposes of engaging in a fraudulent joinder analysis), 9-11 (seeking a finding that Peach was fraudulently joined); *see also* Denise Peach's Opposition to Plaintiff's Motion to Extend Deadline to Respond to Motion to Dismiss (Dkt. No. 18), p. 1 (Peach's Motion to Dismiss is only based "in part" on the fraudulent joinder standard).  The standards for analyzing a Rule 12(b)(6) motion and an application for a finding of fraudulent joinder, however, are markedly different, as Defendant's burden to establish fraudulent joinder is much heavier.

The legal standard for analyzing a Rule 12(b)(6) motion to dismiss is well-known.  In order to survive a Rule 12(b)(6) motion, a complaint simply "must provide fair notice to the defendants and state a facially plausible legal claim."  *Ocasio-Hernandez v. Fortuno-Burset*, 640

F.3d 1, 12 (1st Cir. 2011).  While a court considering a Rule 12(b)(6) motion should disregard "legal conclusion[s]" and "[t]hreadbare recitals of the elements," it must treat all "[n]on-conclusory factual allegations in the complaint . . . as true, even if seemingly incredible." *Id.* (quoting and citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also, e.g.*, *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000) (operating under the same constraints as a district court, an appellate court "may affirm a dismissal for failure to state a claim only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory" and, "[i]n making this determination, [the court] must accept the well-pled facts of [the complaint] as true and indulge every reasonable inference in [plaintiff's] favor.").

"In the context of fraudulent joinder, 'fraudulent is a term of art' that applies to the joinder of an in-state defendant against whom plaintiff 'simply has no chance of success, whatever the plaintiff's motives.'" *In re Zofran (Ondansetron) Prod. Liab. Litig.*, No. 1:15-MD-2657-FDS, 2019 WL 2491587, at *8 (D. Mass. June 13, 2019) (citation omitted) (removal was improper because, despite there being "ample reason to suspect that the [defendant] was joined simply in order to defeat diversity," there was not sufficient evidence to find such joinder fraudulent).  Indeed, the removing defendant "has a 'heavy' burden[;] the 'plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate.'" *Flavin v. Lorillard Tobacco Co.*, No. 15-11796-RGS, 2015 WL 3603883, at *1 (D. Mass. June 8, 2015) (emphasis in original) (quoting *Fabiano Shoe Co. v. Black Diamond Equip., Ltd.*, 41 F. Supp. 2d 70, 71-72 (D. Mass. 1999)).

Where, as here, "any of the parties in interest properly joined and served as defendants is a citizen of the state in which [the] action is brought," 28 U.S.C. § 1441(b)(2) precludes removal.

While the First Circuit has not substantially elaborated on the standard, it has held that a forum defendant, like Peach, may only remove a case on the basis of fraudulent joinder where "there is no reasonable possibility that the state's highest court would find that the complaint states a cause of action upon which relief may be granted against the non-diverse defendant." *Universal Truck & Equip. Co. v. Southworth-Milton, Inc.*, 765 F.3d 103, 108 (1st Cir. 2014) (emphasis added) (discussed by *Rosbeck v. Corin Grp., PLC*, 140 F. Supp. 3d 197, 202-203 (D. Mass. 2015)).  Accordingly, "[t]he removing party bears the burden of demonstrating [fraudulent joinder] by clear and convincing evidence" and "[i]n deciding whether there is a 'reasonable basis in law and fact' for the claim, the Court must 'resolve all disputed questions of fact and any ambiguities in the current controlling substantive law in plaintiffs' favor.'" *Quincy Mut. Fire Ins. Co. v. Vivint Solar Developer, LLC*, No. 17-CV-12343-ADB, 2018 WL 3974820, at *2 (D. Mass. Aug. 20, 2018) (emphasis added) (quoting *Phillips v. Medtronic, Inc.*, 754 F. Supp. 2d 211, 215 (D. Mass. 2010)); *see inVentiv Health Consulting, Inc. v. Equitas Life Scis.*, 289 F. Supp. 3d 272, 282 (D. Mass. 2017); *Rosbeck*, 140 F. Supp. 3d at 203.

Therefore, although akin to a Rule 12(b)(6) motion to dismiss analysis, the fraudulent joinder standard is far more lenient to the plaintiff.  *Rosbeck*, 140 F. Supp. 3d at 203 ("jurisdictions . . . universally review claims of fraudulent joinder under a standard more lenient than that for a motion to dismiss") (internal quotations omitted); *In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 109, 120 (D. Mass. 2006) ("[T]he inquiry into the validity of a complaint triggered by a motion to dismiss under Rule 12(b)(6) is more searching than that permissible when a party makes a claim of fraudulent joinder.").

And, while a court may consider extrinsic evidence (such as affidavits) in resolving the

question of fraudulent joinder, a court not should give controlling weight to the removing party's

factual assertions.  For, the court's "role" at this stage "is not to act as a fact-finder and

conclusively resolve . . . disputed issues," but to "determine whether there is any reasonable

basis . . . for the plaintiff['s] contention ...."  *Clevett v. Equitable Res., Inc.*, No. 05-40020-FDS,

2005 WL 8176473, at *7 (D. Mass. July 20, 2005) (quoting *In re Massachusetts Diet Drug*

*Litig.*, 338 F. Supp. 2d 198, 206 (D. Mass. 2004)).  "To go further would convert [a] remand

motion into a mini-trial on the merits," which a court should decline to do.  *Clevett*, 2005 WL

8176473, at *7; *see Bertrand v. DJO, LLC*, No. CV 10-40039-FDS, 2010 WL 11694998, at *3

n.6 (D. Mass. June 11, 2010) (court could not give controlling weight to assertions in defendants'

affidavits as doing so would turn the motion to remand into a motion for summary judgment).

## ARGUMENT[4]

Applying either standard or both standards, the Court should deny the Motion in its

entirety because the Amended Complaint states plausible claims against Peach for tortious

interference with contract, civil conspiracy, and unjust enrichment.  Therefore, Peach cannot

show (and has not shown) – much less by <u>clear and convincing evidence</u>, as is her "heavy"

burden on an application for a finding of fraudulent joinder – that there is <u>no reasonable</u>

<u>possibility</u> that the <u>Massachusetts Supreme Judicial Court</u> would find that Plaintiff has <u>any viable</u>

<u>theory of recovery against her</u>.  Defendant's submission of two self-serving affidavits (that

merely deny any wrongdoing by Peach) do not change this analysis.

### I.   Bay Equity Has Asserted a Colorable Claim Against Peach for Tortious Interference with Contract

To state a claim for tortious interference with contractual relations, a plaintiff must allege

---

[4] Plaintiff has also filed a Motion for Remand (Dkt. No. 20) and supporting Memorandum (Dkt. No. 21), which also address Defendants' fraudulent joinder arguments.

"(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476 (2001). Here, the allegations in the Amended Complaint indisputably set forth a colorable claim against Peach for tortious interference.

Peach's challenge to Bay Equity's tortious interference claim is narrowly focused on the second element – Peach's knowing interference with the Former Employees' Employment Agreements. Memo. pp. 5-6.[5] Specifically, the Motion proffers that "Bay Equity does not make a single factual allegation that Peach herself even spoke to any of the Former Employees with employment agreements, let alone that she knowingly induced them to breach such contracts." *Id.* p. 6. Moreover, with respect to Plaintiff's allegations that "Defendants knew of the Former Employee's Employment Agreements" and that "Defendants induced those Former Employees to breach" those agreements, the Motion argues that the Amended Complaint states no factual basis upon which such conclusions can be made. *Id.* Both arguments miss the mark.

The Amended Complaint alleges that: Peach was a Regional Branch Manager at Village (Am. Compl. ¶ 42); driven by her personal malice for Village management (Caliendo), Peach – along with Sirmaian and Total Mortgage – raided Village in two coordinated employee lift-outs in December 2018 and April 2019 (*id.* ¶¶ 44-49); in effecting the lift-outs, Defendants

---

[5] Defendant does not (and cannot) deny that Bay Equity has sufficiently alleged the first, third, and fourth elements of the tort. Indeed, the Amended Complaint expressly alleges that: Bay Equity had contracts (the Employment Agreements) with its Former Employees that included no-raid, nonsolicitation, and nondisclosure provisions (Am. Compl. ¶¶ 4, 37-41, 52, 56, 57, 68-69, 81-87; Peach's interference with the Employment Agreements was improper in motive or means (*id.* ¶¶ 49, 59); and Plaintiff has suffered damages and irreparable harm in the form of lost talent (and, by extension, business presence) in the Northeast, lost profits, and lost streams and potential streams of revenue (*id.* ¶ 76).

intimidated and made misrepresentations to Village employees (*id.* ¶¶ 47-48); after Bay Equity's limited asset purchase of Village in July 2019, and continuing to at least March 2020, Defendants continued to raid Bay Equity's employees (*id.* ¶¶ 50-51, 53-55, 58); given the coordinated nature of the raids (*e.g.*, nine employees resigned from Bay Equity *en masse* on February 21, 2020) and the fact that all the Former Employees went to Total Mortgage, Bay Equity believes that the Former Employees solicited and coordinated their resignations with each other, in violation of the no-raid provisions in their Employment Agreements (*id.* ¶¶ 51-52); moreover, given the coordinated nature of the lift-outs, the fact that all the Former Employees went to Total Mortgage, the history between Defendants and the Former Employees (at Village), and Defendants' role in planning and effecting the lift-outs, Bay Equity believes that the Defendants used the Former Employees to solicit Bay Equity employees in knowing violation of their Employment Agreements (*id.* ¶¶ 50-57); Peach's interference with the Former Employees' Employment Agreements was once again motivated, at least in part, by her personal malice for Caliendo (who was now part of Bay Equity management) (*id.* ¶¶ 53-56, 59).

Drawing all reasonable inferences in Bay Equity's favor, as the Court is required to do, and considering the totality of circumstances, it is not unreasonable to infer that Peach, as one of the alleged participants of the Bay Equity lift-outs (after serving as a ringleader of the Village lift-outs) would have used the Former Employees to solicit Bay Equity employees in violation of their Employment Agreements, despite knowing about the agreements at the time.  It is also not unreasonable to infer that Peach would have planned for and helped to effect the Former Employees' violation of their nonsolicitation and nondisclosure covenants.  *See supra* Section C.

Bay Equity has therefore sufficiently pled its tortious interference claim under Massachusetts law and the fact that the Amended Complaint alleges similar misconduct against

multiple Defendants is of no moment. *See, e.g.*, *Lounge 22, LLC v. Scales*, 680 F. Supp. 2d 343, 346 (D. Mass. 2010) (tortious interference claim alleged against owner of a competitor survived motion to dismiss, despite challenge "for lacking sufficient factual allegations," where the relationship between plaintiff's former employee and employee's new employer "supplied the opportunity for [the competitor] to knowingly induce [employee] to breach her contractual duties of confidentiality and loyalty"); *W.B. Mason Co. v. Staples, Inc.*, No. 00-5042 BLS, 2001 WL 227855, at *8 (Mass. Super. Jan. 18, 2001) (Staples had likelihood of success on the merits of its claim against W.B. Mason for tortious interference where W.B. Mason offered positions to Staples' employees, while aware of their agreements with Staples, and instructed the employees to resign without warning and to start calling on their former customers); *see also Nekoroski v. Mathai*, No. 11-4315-BLS1, 2012 WL 5309524, at *7 (Mass. Super. Sept. 28, 2012) ("though there [was] no particularization of who among [derivative claimants] did what," court denied motion to dismiss, finding that "[i]t [was] also unlikely that the Former Employees could be any more specific than they have been concerning each member's or manager's involvement, absent discovery.").[6]

---

[6] Defendant offers three discrete reasons for why the Court should grant her Motion with respect to the tortious interference claim, however none are persuasive. First, she observes that "there is absolutely nothing unlawful with soliciting employees to leave one company and join another[.] Memo., p. 5. While Defendant's observation is not incorrect, it is inapt – Plaintiff's tortious interference claim against Peach is not based solely on her direct solicitation of Bay Equity employees but rather her interference with the Former Employees' Employment Agreements. *See* Am. Compl. ¶¶ 83-86. Plaintiff's specific allegations concerning some of Peach's nonactionable conduct provide circumstantial evidence from which the Court may draw reasonable inferences concerning Defendants' conspiracy (including the scope thereof) and Peach's involvement therein. Second, Peach baldly concludes that Chris Sweeney is the only employee that "Peach even potentially solicited" according to the Amended Complaint. Memo., p. 6. This statement is incorrect, as the Amended Complaint more broadly alleges that Peach used the Former Employees to solicit remaining Bay Equity employees, in violation of the Former Employees' no-raid agreements. Am. Compl. ¶ 56. Third, Peach attempts to extrapolate meaning from Plaintiff's wording in its original Complaint filed in the state court action (in particular, its use of the words "permitted" and "permitting") as some kind of admission by Plaintiff that it can allege no greater involvement by Peach in the Former Employees' breach of their Employment Agreements. Memo., p. 7.

Plaintiff has plausibly alleged a claim against Peach for tortious interference with contractual relations (Count I).  Peach therefore cannot meet (and has not met) her burden to prove, by clear and convincing evidence, that there is no reasonable possibility that the Massachusetts Supreme Judicial Court would deny a motion to dismiss Count I as to Peach. Accordingly, and even if on this basis alone, the Court should deny the Motion and remand the case to Middlesex Superior Court pursuant to Plaintiff's Motion to Remand.

## II.      Bay Equity Has Asserted a Colorable Claim Against Peach for Civil Conspiracy

Likewise, the Amended Complaint states a plausible claim against Peach for conspiracy, and Peach cannot demonstrate by clear and convincing evidence that the Massachusetts Supreme Judicial Court would disagree.  To state a claim for civil conspiracy, a plaintiff must allege that a defendant "devised 'a common plan to commit a tortious act where the participants [knew] of the plan and its purpose and [took] affirmative steps to encourage the achievement of the result.'" *Hadley Pollett, LLC v. Yun Zhu*, 2009 WL 5909268, at *3 (Mass. Super. Dec. 10, 2009) (quoting *Kurker v Hill*, 44 Mass. App. Ct. 184, 189 (1998)); *see Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 415 (2002) ("To establish a civil conspiracy, a plaintiff must demonstrate that a combination of persons [acted] pursuant to an agreement to injure the plaintiff.") (internal quotations omitted).  "Substantial assistance" or "encouragement" is sufficient and a defendant need not be specifically named in each discrete scheme in order to warrant liability.  *See Erez v. Batrin*, 88 Mass. App. Ct. 1112 (2015) (unpublished).

The Motion argues in broad strokes that the allegations set forth in the Amended

---

This argument is without basis and seeks to, among other things, create an issue of fact out of an outdated pleading.  (In any case, the Court must resolve all disputed facts and reasonable inferences in favor of Plaintiff.)

Complaint are too threadbare to plausibly allege a claim for civil conspiracy against Peach.

Memo., p. 7.  However, as described above, the Amended Complaint alleges (and provides an

adequate basis to reasonably infer) that Peach conspired with Defendants Sirmaian and Total

Mortgage to damage Bay Equity, including by using Former Employees to move other Bay

Equity employees, Bay Equity's confidential information, and Bay Equity's clients and potential

clients to Total Mortgage, all in violation of their Employment Agreements.  *See supra* Section I.

The Amended Complaint also alleges that Peach took affirmative steps to effect the scheme to

hurt Bay Equity, including by soliciting Bay Equity employees.  Am. Compl. ¶¶ 53-56, 70-74.

Thus, the Amended Complaint asserts a colorable claim for civil conspiracy against

Peach.  *See, e.g.*, *Erez*, 2015 WL 6873158, at *1-2  (where defendant was not specifically named

in every scheme, but the complaint alleged that all defendants knowingly agreed to participate in

a common plan to defraud plaintiff, and provided substantial assistance in doing so, allegations

"provide[d] enough information to give the defendant notice of what the dispute [was] about and

assert[ed] a right to recovery cognizable on some acceptable legal theory.") (internal quotations

omitted); *Hanna v. Williams*, 2017 WL 2292756, at *9 (Mass. Super. Jan. 9, 2017) ("All the

plaintiffs must show [is] an underlying tortious act in which two or more persons acted in concert

and in furtherance of a common design or agreement") (internal quotations omitted); *Desrochers*

*v. Tiax*, LLC, 2003 WL 21246150, at *9 (Mass. Super. May 1, 2003) (where the underlying tort

survives dismissal, it is "premature" for a court to determine (on a motion to dismiss) whether or

not a conspiracy existed).

That Plaintiff cannot yet allege more direct proof of Peach's participation in Defendants'

conspiracy is attributable to the clandestine nature of Defendants' actions that form the basis of

the claim.  Indeed, courts in Massachusetts have long recognized that conspiracies are seldom

susceptible of direct proof and may instead be established from circumstantial evidence.  *See,*
*e.g.*, *Commonwealth v. Haley*, 91 Mass. App. Ct. 1106 (2017) ("A conspiracy does not need to
be proved by direct evidence of participation . . . and may be (and usually is) established by
circumstantial evidence . . . . The common purpose . . . may be inferred from concerted action
converging to a definite end.") (internal quotations and citations omitted) (unpublished);
*Ferguson v. Omnimedia, Inc.,* 469 F.2d 194, 198 (1st Cir. 1972) ("In a conspiracy case,
agreement is rarely out in the open, and proof of conscious complicity may depend upon the
careful marshalling of circumstantial evidence and the opportunity to cross-examine hostile
witnesses . . . . summary judgment procedures are often not a sufficient substitute for trial.");
*Williams v. City of Bos.*, 771 F. Supp. 2d 190, 205 (D. Mass. 2011) ("[T]he agreement that rests
at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such
agreement must be inferred from all the circumstances."); *Philbrook v. Perrigo*, 637 F. Supp. 2d
48, 57 (D. Mass. 2009) (quoting *Ferguson* and observing that a reasonable juror "is better
positioned than the Court is at [the summary judgment] stage of litigation to undertake such a
fact-intensive analysis" as to the existence of a conspiracy).

　　　　Defendant next argues that the intracorporate conspiracy doctrine bars Plaintiff's civil
conspiracy claim against Peach.  Memo., p. 7-8.  Whether or not Peach was acting wholly within
the course of her employment with Total Mortgage (*i.e.*, in her official capacity as Total
Mortgage's employee) when she engaged in the tortious misconduct, discussed above, is a
question of fact that should be resolved only after discovery.  *See, e.g.*, *Beriont v. GTE Labs.,*
*Inc.*, 60 Mass. App. Ct. 1108 n.3 (2003) (unpublished) ("The determination [of] whether conduct
falls within the scope of employment is a question of fact.") (citing *Pinshaw v. Metro. Dist.*
*Comm'n.*, 402 Mass. 687, 694 (1988)).  Moreover, the Amended Complaint reasonably suggests

that Defendants' scheme to damage Village's business (which later became Bay Equity's business) predated Peach's employment with Total Mortgage.  *See* Am. Compl. ¶¶ 44-45, 47.[7] And the Amended Complaint does not allege that Peach acted only in her capacity as an agent of Total Mortgage.  Indeed, the Affidavit of Scott Penner (Dkt. No. 16) submitted in support of Defendant's Motion expressly states that "Denise Peach had no responsibilities to recruit Bay Equity's employees for Total Mortgage and . . . has not received any compensation related to Total Mortgage's hiring of former Bay Equity Employees."  Penner Aff. ¶ 3.  Construing this fact favorably to Plaintiff, one can reasonably conclude that any involvement by Peach in the lift-out of Bay Equity's employees would have been outside the scope of her employment at Total Mortgage.  *See id.*  Additionally, there is an exception to the intracorporate conspiracy doctrine when the officer or employee is not acting solely in their corporate capacity.  *See United States v. Aegerion Pharmaceuticals, Inc.*, No. 13-cv-11785-IT, 2019 WL 1437914, at *9-10 (D. Mass. March 31, 2019) (denying request to dismiss conspiracy claim where the conspirator had an interest that was "distinct from the company's financial interest."); *see also Williams v. Northfield Mount Hermon Sch.*, 504 F. Supp. 1319, 1329 (D. Mass. 1981) (finding that an alleged conspiracy claim "might be legally sufficient if facts were alleged that indicated [the] defendants took actions not in accordance with their duties as [employees]"); *Cape Cod Food Prod. v. Nat'l Cranberry Ass'n*, 119 F. Supp. 900, 909 (D. Mass. 1954) (there is an exception to the intracorporate conspiracy doctrine when the defendant is acting both for the "company and their own account").  Accordingly, the allegation that Peach acted out of a personal vendetta for

---

[7] Peach's assertion that "Bay Equity's allegations against Peach are that she was 'instrumental in coordinating' a lift-out of employees from Village Mortgage Company ('Village'), which is not a party to this action," (Memo., p. 4) mistakenly implies that Bay Equity is not able to assert claims arising out of Defendants' misconduct toward Village.

Caliendo, when construed in Plaintiff's favor, is enough to bring Peach's actions within the scope of the exception to the doctrine.  Accordingly, the Amended Complaint sufficiently states a claim for civil conspiracy (Count VII) against Peach, the Motion should be denied, and there is no basis for finding fraudulent joinder.  Remand is warranted on this basis alone.

## III.     Bay Equity Has Asserted a Colorable Claim Against Peach for Unjust Enrichment

Bay Equity's final claim against Peach is for unjust enrichment.  "A plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, a quality that turns on the reasonable expectations of the parties." *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 644 (2013) (internal quotations omitted).  Bay Equity has specifically pled that the Defendants, including Peach, have received a benefit in the form of Bay Equity's confidential information.  Am. Compl. ¶ 138.  Bay Equity has also set forth specific facts establishing that it has a more-than-reasonable expectation that its confidential information will remain confidential and will be used only in furtherance of its business, so Peach's receipt of and use of that information is therefore unjust.  *See id.* ¶¶ 17-23.  Accordingly, as with the other claims asserted against Peach, there is no reasonable possibility that the state's highest court would find that the Amended Complaint fails to state a cause of action for unjust enrichment (Count VIII) against Peach and the Court should deny Peach's Motion on that basis.

## CONCLUSION

For the foregoing reasons, the Court should deny Denise Peach's Motion to Dismiss for Fraudulent Joinder, with a specific finding that Peach has satisfied neither the Rule 12(b)(6) standard nor her burden to establish fraudulent joinder, and remand this case to Middlesex Superior Court in accordance with Plaintiff's Motion to Remand (Dkt. No. 20).

Respectfully submitted,

BAY EQUITY LLC,

By its attorneys,

*/s/ Stephen D. Riden*
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
Hannah T. Joseph, BBO No. 688132
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110
(617) 500-8660 Telephone
(617) 500-8665 Facsimile
*rbeck@beckreed.com*
*sriden@beckreed.com*
*hjoseph@beckreed.com*

Dated:  May 6, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the CM/ECF system on May 6, 2020, and will be served electronically to the registered participants as identified on the Notice of Electronic Filing through the Court's transmission facilities, and that non-registered participants have been served this day by mail.

*/s/ Stephen D. Riden*